# SANDBERG ET AL. *v.* McDONALD, CLAIMANT OF THE BRITISH SHIP "TALUS."

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE FIFTH CIRCUIT.

No. 392.   Argued November 5, 1918.—Decided December 23, 1918.

Section 11 of the Seaman's Act of 1915, c. 153, 38 Stat. 1164, prohibits, under criminal penalties, the payment of wages in advance to any seaman, provides that in no case shall such advancements absolve vessel, master or owner from full payment of wages when actually earned, or be a defense to a libel or action for their recovery; applies "as well to foreign vessels while in waters of the United States, as to vessels of the United States;" makes the master, owner, consignee, or agent of any foreign vessel who violates its provisions liable to the same penalty as if the vessel were domestic; and, requiring exhibition of shipping articles, denies clearance from our ports to any vessel of either class, unless the provisions of the section have been complied with. *Held,* not to apply to advancements made to alien seamen shipping abroad on a foreign vessel, pursuant to contracts valid under the foreign law; and that such advancements may be allowed for in paying such seamen in a port of the United States. P. 195.

A provision in this act for the abrogation of inconsistent treaty provisions is not opposed to the above construction, since it may properly be referred to other parts of the act abolishing arrest for desertion and conferring jurisdiction on our courts over wage controversies arising in our jurisdiction. P. 196.

The construction here adopted is the same as that adopted by the State Department in consular instructions; and the reports and

proceedings attending the legislation in Congress, so far as they may be considered, do not require a different conclusion. P. 197.
248 Fed. Rep. 670, affirmed.

THE case is stated in the opinion.

*Mr. Alex. T. Howard* for petitioners:

It was the broad purpose of Congress to grant to the seaman personal liberty and to prohibit as to all vessels that came within our jurisdiction the evil of paying the seaman his wages in advance and thereby to promote the welfare of the American merchant marine and the American seaman by an equalization of wages.

The language of the act is broad enough to cover such an advance, and even if this were not the case the payment of such an advance ought not to be upheld by an American court, when it is passing upon the civil rights of the parties with the *res* before it, because so clearly opposed to our public policy. Senate Doc. No. 228, 65th Cong., 2d sess.; 41st Ann. Report, Legal Aid Society.

The legislative history of the act shows that its purpose was to equalize wages. Report No. 645, 62d Cong., 2d sess., p. 7; *id.* pt. 2, pp. 2, 3, 5; Report No. 852, 63d Cong., 2d sess., pp. 19, 20.

By changing § 11 of the bill so as to make it apply "as well to foreign vessels as to vessels of the United States" instead of merely "to seamen engaged in ports of the United States for service on foreign vessels," Congress showed its purpose to prohibit advances to the full extent and thereby to equalize wages and to make possible the enforcement of the other humane provisions of the act.

The language is unambiguous and should be given its ordinary meaning. It was erroneous to limit the construction of the section by constraining the civil to the same field as the criminal provisions. *United States* v. *Twenty-five Packages of Hats*, 231 U. S. 358.

*Mr. W. J. Waguespack* for petitioners:

The penalty provision of the statute under the rule of construction in *United States* v. *Freeman,* 239 U. S. 117, is within the scope of legislative authority. The intent that § 11 should apply to foreign vessels when they enter into the ports of the United States to load and unload cargo, and while they remain in the waters of the United' States, is manifest, for the statute provides that any master or owner of a foreign vessel who *has* violated this provision shall be liable for the penalty.

It is obvious that § 11 forms part of the general plan which Congress has mapped out to elevate and better the condition of American seamen, to secure a higher · standard of service, and to benefit the American merchant marine by equalizing the costs of operation between our ships and those of other nations, for, as said by this court in *The Eudora,* 190 U. S. 169, "no one can doubt that the best interests of seamen as a class are preserved by such legislation."

The immediate purpose which Congress had in view in adopting this criminal provision was evidently to prohibit the entry into the ports of the United States of vessels with seamen who were victims of "crimps," as they are called, and who, having been paid advance wages, stood in a state of continuous involuntary servitude, to the end that discrimination against American seamen, and Ameri-. can shipowners, might be avoided.

The penalty provision of the statute and the civil provision are separable and it is obvious that Congress would have enacted the legislation with the penalty provision eliminated. *McCullough* v. *Virginia,* 172 U. S. 102; *Railroad Co.* v. *Schutte,* 103 U. S. 118; *James* v. *Bowman,* 190 U. S. 127; *Chesapeake & Ohio Ry. Co.* v. *Kentucky,* 179 U. S. 388; *New York* v. *Miln,* 11 Pet. 102.

Assuming that no special policy against the making of advances against foreign seamen in a foreign port can be

deduced from § 11, still a public policy against making
such advances everywhere can be deduced from the fact
that it would operate injuriously against the general
interest and policy of our own citizens. *Bank* v. *Owens*,
2 Pet. 527–538; *Woodward* v. *Roane*, 23 Arkansas, 523;
*Marshall* v. *Sherman*, 148 N. Y. 9; *Hill* v. *Spear*, 50 N.
H. 253; *The Kensington*, 183 U. S. 263.

The court erred in concluding that libelants were de-
serters, and in decreeing their wages forfeited.

*Mr. Palmer Pillans*, with whom *Mr. J. N. McAleer* was
on the brief, for the ship, reviewed the prior legislation,
and held that, so far as the matter in question was con-
cerned, no new purpose was evinced by the present act.
The section, as in previous laws, applied only to advance-
ments made in our own waters. It should be taken with
the old construction. They cited and discussed the follow-
ing: *The State of Maine*, 22 Fed. Rep. 734; *The Windrush*,
250 Fed. Rep. 180; *The Elswick Tower*, 241 Fed. Rep 706,
710; *Patterson* v. *Bark Eudora*, 190 U. S. 169, 178, 179;
*American Banana Co.* v. *United Fruit Co.*, 213 U. S. 347,
357; *United States* v. *Freeman*, 239 U. S. 117, 120; *Ken-
ney* v. *Blake*, 125 Fed. Rep. 672; *The Alnwick*, 132 Fed.
Rep. 117; *The Neck*, 138 Fed. Rep. 144, 146; *The Bound
Brook*, 146 Fed. Rep. 160, 162; *The Kestor*, 110 Fed. Rep.
432, 434, 438, 441, 442, 444; *The Troop*, 117 Fed. Rep.
557, 560; *The Meteor*, 241 Fed. Rep. 735; *The London*,
241 Fed. Rep. 863; affirming 238 Fed. Rep. 645; *The Ante-
lope*, 10 Wheat. 66; *Northern Pacific Ry. Co.* v. *Babcock*,
154 U. S. 198.

There is necessarily and tacitly attached to every en-
actment declaring a particular act unlawful the idea that
the act shall be one committed within the sovereignty
of the sovereign making the enactment. Such must be
the case here. As the United States could not make it
unlawful for a British master to pay seamen on a British

ship advance wages in Great Britain it is only reasonable to intend that the act, with this idea in mind, not only may be, but must be read thus: "That it shall be and is hereby made unlawful in any case to pay any seaman wages (anywhere within the territorial jurisdiction of the United States) in advance of the time," etc. It ought to be manifest, that the words "in any case" do not mean "in any place" or "anywhere," but do mean "under any set of circumstances that may arise when advance payments are made within the territorial jurisdiction of the United States." *American Banana Co.* v. *United Fruit Co.*, 213 U. S. 347, 357. And see *United States* v. *Freeman*, 239 U. S. 117, 120.

It should be noted that it is not the payment of advance wages, without more, that it is declared shall in no case absolve the vessel, but the payment of "such advance wages," that shall in no case absolve, etc. What does the "such" refer to? Unlawful advancements, of course, and no advancements are such unlawful advancements unless they are made within the territorial jurisdiction of the United States.

*Mr. Assistant Attorney General Brown*, with whom *Mr. Robert Szold* was on the brief, for the United States as *amicus curiæ:*

The evil sought to be remedied was the handicap of higher wage cost under which the then decadent American merchant marine was laboring. President's Message of December 7, 1903; Report of Merchant Marine Commission, January 4, 1905 (39 Cong. Rec., pt. 1, pp. 437-439; Senate Report No. 2755, 58th Cong., 3d sess.) Annual Report, Commissioner of Navigation, 1915, p. 159. Act of June 26, 1884, c. 121; 23 Stat. 53, § 20.

The legislative purpose to equalize the wage cost of foreign and domestic vessels leaving our ports was accomplished by limiting the enforcement of foreign contracts.

The deliberate intent to cover contracts made abroad is shown by the committee reports and legislative history. House Report No. 645, 62d Cong., 2d sess.; House Report No. 852, 63d Cong., 2d sess.; H. R. 23673, 62d Cong., 2d sess., 48 Cong. Rec., pp. 5242, 9259, 9429, 9431, 9432, 9434, 9435, 9502, 9503; Report Commissioner of Navigation, 1906, pp. 64, 92; 49 Cong. Rec., pt. 5, pp. 4567, 4588, 4806, 4854; 50 Cong. Rec. 5749; 52 Cong. Rec. 4646.

A reading of the act as a whole also shows this intent.

Section 4 is valid as a condition upon the entry of foreign vessels into American ports. The power to impose such conditions is an incident to the sovereignty of the nation. Vattel, Law of Nations (Chitty, ed. 1863), p. 40; *Patterson* v. *Bark Eudora*, 190 U. S. 169; *Oceanic Steam Navigation Co.* v. *Stranahan*, 214 U. S. 320; *Buttfield* v. *Stranahan*, 192 U. S. 470, 492, 493; *Weber* v. *Freed*, 239 U. S. 325, 329; *Turner* v. *Williams*, 194 U. S. 279, 289.

It seems clear in this case that Congress was seeking to impose the wage requirement as a condition to the entry of foreign vessels. *Oceanic Steam Navigation Co.* v. *Stranahan*, 214 U. S. 320; *Patterson* v. *Bark Eudora*, 190 U. S. 169.

The statute declares a rule of policy of the forum forbidding the enforcement of such contracts. *The Kensington*, 183 U. S. 263; *Fonseca* v. *Cunard S. S. Co.*, 153 Massachusetts, 553.

There is no question of the validity with respect to contracts executed between foreign seamen and foreign masters within the United States.

MR. JUSTICE DAY delivered the opinion of the court.

This case brings before us for consideration certain features of the so-called "Seaman's Act." (38 Stat. 1164.) The act is entitled: "An Act To promote the welfare of American seamen in the merchant marine of

the United States; to abolish arrest and imprisonment as a penalty for desertion and to secure the abrogation of treaty provisions in relation thereto; and to promote safety at sea." It contains numerous provisions intended to secure better treatment of seamen, and to secure for them better conditions of service.

The libel charges a demand in Mobile, Alabama, for one-half part of the wages then earned by the seamen, and the refusal of the master to pay the amount which the libelants claimed to be due. The master paid each of them what he conceived to be due, deducting certain advances made to the men at Liverpool, England, where the seamen were signed.

The facts are:

The "Talus" is a British ship and the libelants and petitioners citizens or subjects of nations other than the United States and at the time of employment by the ship and before boarding her they received certain advances at Liverpool by the ship or its agents, a practice usual and customary and not forbidden by the laws of Great Britain. The advance did not, as to any libelant, exceed the amount of a month's wages.

The libelants boarded the ship at Dublin, Ireland, December 1, 1916, and remained in her service until they left her at Mobile, Alabama.

The ship arrived in American waters on February 11, 1917, off Fort Morgan, from whence she proceeded immediately to Mobile, where she remained until after February 24, and unloaded and loaded cargoes. During the voyage and at Mobile prior to February 22, libelants received certain payments from the ship in cash and in articles purchased from it.

On February 22 libelants demanded of the master of the ship payment of one-half of the wages earned by them to that date. The master then paid to them a sum which, with the cash paid them and the price of the articles

purchased as stated above, together with the advances made in Liverpool, equaled or exceeded the one-half of the wages then earned by each of them from the commencement of his service for the ship. It was less, however, than such one-half wages if the advances at Liverpool had not been included in the credits. The master claimed that those advances should be deducted from the one-half wages, and did deduct them, and the sum or sums paid by the master to the libelants exceeded the amount of wages earned by them for the eleven days the ship had been in American waters. The libelants quit the ship February 24, 1917, and were logged as deserters on the same day.

Under the foregoing statement of facts the question for decision is: Was the master entitled to make deduction from the seamen's pay in the amount of the advancements made at Liverpool? The District Court held that these advancements could not be deducted. 242 Fed. Rep. 954. The Circuit Court of Appeals reached the opposite conclusion. 248 Fed. Rep. 670. The pertinent section of the act for consideration reads:

"'Sec. 10 (a) That it shall be, and is hereby, made unlawful in any case to pay any seaman wages in advance of the time when he has actually earned the same, or to pay such advance wages, or to make any order, or note, or other evidence of indebtedness therefor to any other person, or to pay any person, for the shipment of seamen when payment is deducted or to be deducted from a seaman's wages. Any person violating any of the foregoing provisions of this section shall be deemed guilty of a misdemeanor, and upon conviction shall be punished by a fine of not less than $25 nor more than $100, and may also be imprisoned for a period of not exceeding six months, at the discretion of the court. The payment of such advance wages or allotment shall in no case except as herein provided absolve the vessel or the master or the

owner thereof from the full payment of wages after the same shall have been actually earned, and shall be no defense to a libel suit or action for the recovery of such wages. If any person shall demand or receive, either directly or indirectly, from any seaman or other person seeking employment, as seaman, or from any person on his behalf, any remuneration whatever for providing him with employment, he shall for every such offense be deemed guilty of a misdemeanor and shall be imprisoned not more than six months or fined not more than $500.

\* \* \* \* \* \* \* \*

"'(e) That this section shall apply as well to foreign vessels while in waters of the United States, as to vessels of the United States, and any master, owner, consignee, or agent of any foreign vessel who has violated its provisions shall be liable to the same penalty that the master, owner, or agent of a vessel of the United States would be for similar violation.

"'The master, owner, consignee, or agent of any vessel of the United States, or of any foreign vessel seeking clearance from a port of the United States, shall present his shipping articles at the office of clearance, and no clearance shall be granted any such vessel unless the provisions of this section have been complied with.'"

The genesis and history of this legislation are found in U. S. Compiled Statutes, 1916, vol. 7, § 8323, annotated.

The Dingley Act of 1884 (23 Stat. 55, 56), which is the origin of this section, contains terms much like those found in this act. That statute, as the present one, in the aspect now before us, was intended to prevent the evils arising from advanced payments to seamen, and to protect them against a class of persons who took advantage of their necessities and through whom vessels were obliged to provide themselves with seamen. These persons obtained assignments of the advanced wages of sailors. In many instances this was accomplished with

little or no service to the men who were obliged to obtain employment through such agencies. In the Dingley Act it was made unlawful to pay seamen's wages before leaving the port at which he was engaged. In the present act it is made unlawful to pay seamen's wages in advance of the time when he has actually earned the same. The Act of 1884 by its terms applied as well to foreign vessels as to the vessels of the United States, and masters of foreign vessels violating the law were refused clearance from any port of the United States. The present statute is made to apply as well to foreign vessels while in the waters of the United States as to vessels of the United States.

In the present statute, in the section from which we have just quoted, masters, owners, consignees, or owners of foreign vessels are made liable to the same penalties as are the like persons in case of vessels of the United States. Such persons in case the vessels are those of the United States or foreign vessels, seeking clearance in ports of the United States, are required to present their shipping articles at the office of clearance, and no clearance is permitted unless the provisions of the statute are complied with.

The Act of 1884 came before the United States District Court for the Southern District of New York in the case of *The State of Maine*, 22 Fed. Rep. 734. In a clear and well-reasoned opinion by Judge Addison Brown the law was held not to apply to the shipment of seamen on American vessels in foreign ports. After some amendments in 1898, not important to consider in this connection, the matter came before this court in the case of *Patterson v. Bark Eudora*, 190 U. S. 169, and it was held to apply to a British vessel shipping seamen at an American port, and, furthermore, that the act, as thus applied to a foreign vessel in United States waters, was constitutional.

. While the Seaman's Act of 1915 contains many provisions for the amelioration of conditions as to employment and care of seamen, in the aspect now involved we have called attention to the state of legislation and judicial decision when that act was passed. Did Congress intend to make invalid the contracts of foreign seamen so far as advance payment of wages is concerned, when the contract and payment were made in a foreign country where the law sanctioned such contract and payment? Conceding for the present purpose that Congress might have legislated to annul such contracts as a condition upon which foreign vessels might enter the ports of the United States, it is to be noted, that such sweeping and important requirement is not found specifically made in the statute. Had Congress intended to make void such contracts and payments a few words would have stated that intention, not leaving such an important regulation to be gathered from implication. There is nothing to indicate an intention, so far as the language of the statute is concerned, to control such matters otherwise than in the ports of the United States. The statute makes the payment of advance wages unlawful and affixes penalties for its violation, and provides that such advancements shall in no cases, except as in the act provided, absolve the master from full payment after the wages are earned, and shall be no defense to a libel or suit for wages. How far was this intended to apply to foreign vessels? We find the answer if we look to the language of the act itself. It reads that this section shall apply to foreign vessels "while in waters of the United States."

Legislation is presumptively territorial and confined to limits over which the law-making power has jurisdiction. *American Banana Co.* v. *United Fruit Co.* 213 U. S. 347, 357. In *Patterson* v. *Bark Eudora, supra,* this court declared such legislation as to foreign vessels in United States ports to be constitutional. We think that

there is nothing in this section to show that Congress intended to take over the control of such contracts and payments as to foreign vessels except while they were in our ports. Congress could not prevent the making of such contracts in other jurisdictions. If they saw fit to do so, foreign countries would continue to permit such contracts and advance payments no matter what our declared law or policy in regard to them might be as to vessels coming to our ports.

In the same section, which thus applies the law to foreign vessels while in waters of the United States, it is provided that the master, owner, consignee, or agent of any such vessel, who violates the provisions of the act, shall be liable to the same penalty as would be persons of like character in respect to a vessel of the United States. This provision seems to us of great importance as evidencing the legislative intent to deal civilly and criminally with matters in our own jurisdiction. Congress certainly did not intend to punish criminally acts done within a foreign jurisdiction; a purpose so wholly futile is not to be attributed to Congress. *United States v. Freeman*, 239 U. S. 117, 120. The criminal provision strengthens the presumption that Congress intended to deal only with acts committed within the jurisdiction of the United States.

It is true the act provides for the abrogation of inconsistent treaty provisions, but this provision has ample application treating the statute to mean what we have here held to be its proper construction. It abolishes the right of arrest for desertion. It gives to the civil courts of the United States jurisdiction over wage controversies arising within our jurisdiction. These considerations amply account for the treaty provision. See Treaties in Force, ed. 1904, index, p. 969.

It is said that the advances in foreign ports are against the policy of the United States and, therefore, not to be

sanctioned here.   As we have construed this section of the statute, no such policy as to foreign contracts legal where made, is declared.

We have examined the references in the briefs of counsel to the reports and proceedings in Congress during the progress of this legislation so far as the same may have weight in determining the construction of this section of the act.   We find nothing in them, so far as entitled to consideration, which requires a different meaning to be given the statute.   We may add that the construction now given has the sanction of the Executive Department as shown in Instructions to Consular Officers, promulgated through the medium of the State Department.

We are of opinion that the Circuit Court of Appeals reached the right conclusion as to the meaning and interpretation of this section of the act, and its judgment is

*Affirmed.*

Mr. Justice McKenna, with whom concur Mr. Justice Holmes, Mr. Justice Brandeis and Mr. Justice Clarke, dissenting.

This is a libel in admiralty under the Seamen's Act of 1915 (38 Stat. 1164–1168), especially involving § 11.

The libel was filed by petitioners here and others.   It was dismissed as to the latter and they have acquiesced in the judgment.   The facts are set out in the opinion of the court.

With this case were submitted others that present the act of Congress in different aspects.   Among these was No. 361 [*Dillon* v. *Strathearn S. S. Co., ante,* 182].   It was a libel by a seaman who had shipped on a British vessel and was based on a demand for wages not due at the time of the demand under the terms of the shipping articles signed by him.   Section 4 of the act, *infra,* was especially involved in consideration and its constitu-

tionality was attacked by the ship. The Circuit Court of Appeals for the Fifth Circuit, to which the case had gone, presented the question to this court in two aspects, first generally, and, second, more particularly that provision which makes the section "apply to seamen on foreign vessels while in harbors of the United States."

In the present case the ship is also British and the libelants and petitioners citizens or subjects of nations other than the United States, and the controversy is as to the right of the master to deduct from the wages, of which the law authorizes the demand, advances made to the seamen in Liverpool, England. To make such advances was a practice usual and customary and not forbidden by English law. It would seem, therefore, that the constitutional question is as much involved in one case as in the other. But under the court's construction of the act that question can be pretermitted. Under our construction it would seem to be not only of ultimate but of first insistence. The court, however, is of opinion that the question of the constitutionality of the act was not certified in such manner as to be subject to its consideration. From that conclusion we are not disposed to dissent and shall assume, as the court does, that the legislation is valid and pass to its consideration.

The instant case, the facts not being in dispute, is brought to the question of the right of the master to deduct the Liverpool advances, the ship asserting the right and the libelants denying it. The solution of the question necessarily depends upon the construction of the act, or, more precisely, its application. It is conceded, yielding to the authority of. *Patterson* v. *Bark Eudora*, 190 U. S. 169, that the act applies to American seamen shipping in an American port upon foreign vessels, but it is contended from that case and other cases that it ought "to seem plain on principle and authority that the advancements statute has no effect except upon advancements

made to seamen within the territorial jurisdiction of the United States." And, indeed, it is insisted that Congress "*ex industria* in terms confined the application to the waters of the United States." The conclusions are deduced from the cases which are reviewed and the language of the act is quoted. We give the quotation as it amplifies the contentions:

"That this section shall apply as well to foreign vessels *while in waters of the United States* [counsels' emphasis], as to vessels of the United States, and any master, owner, consignee, or agent of any foreign vessel who has violated its provisions shall be liable to the same penalty that the master, owner, or agent of a vessel of the United States would be for similar violation.

"The master, owner, consignee, or agent of any vessel of the United States, or of any foreign vessel seeking clearance from a port of the United States, shall present his shipping articles at the office of clearance, and no clearance shall be granted any such vessel unless the provisions of this section have been complied with."·

The quotation is but a part of § 11.[1] It is preceded by

---

[1] Section 11 was an amendment of § 24 of the Act of December 21, 1898, and § 24 was an amendment of § 10 of the laws of 1884 as amended in 1886, and, as it now stands as far as pertinent, is as follows:

"Sec. 10 (a) That it shall be, and is hereby, made unlawful in any case to pay any seaman wages in advance of the time when he has actually earned the same, or to pay such advance wages, or to make any order, or note, or other evidence of indebtedness therefor to any other person, or to pay any person, for the shipment of seamen when payment is deducted or to be deducted from a seaman's wages. Any person violating any of the foregoing provisions of this section shall be, deemed guilty of a misdemeanor, and upon conviction shall be punished by a fine of not less than $25 nor more than $100, and may also be imprisoned for a period of not exceeding six months, at the discretion of the court. The payment of such advance wages or allotment shall in no case except as herein provided absolve the vessel or the master or the owner thereof from the full payment of wages after the same shall have been actually earned, and shall be no defense

the explicit declaration that it is "unlawful in any case to pay any seaman wages in advance of the time when he has actually earned the same, or to pay such advance wages." There is no limitation of place or circumstances. and the universality of the declaration is given emphasis and any implication of exception is precluded with tautological care by the provision that "the payment of such advance wages or allotment shall in no case except as herein provided absolve the vessel or the master or the owner thereof from the full payment of wages after the same shall have been actually earned, and shall be no defense to a libel suit or action for the recovery of such wages." To qualify these provisions or not to take them for what they say, would, in our opinion, ascribe to the act an unusual improvidence of expression. And § 4 should be considered in connection. It is hence important that we give it in full. And it may be said that it is an amendment to § 4530, Rev. Stats. It is as follows:

"'Sec. 4530. Every seaman on a vessel of the United States shall be entitled to receive and demand from the master of the vessel to which he belongs one-half part of the wages which he shall have then earned at every port where such vessel, after the voyage has been commenced, shall load or deliver cargo before the voyage is ended and all stipulations in the contract to the contrary shall be void: *Provided,* Such a demand shall not be made before the expiration of, nor oftener than once in five days. Any failure on the part of the master to comply with this demand shall release the seaman from his contract and

---

to a libel suit or action for the recovery of such wages. If any person shall demand or receive, either directly or indirectly, from any seaman or other person seeking employment, as seaman, or from any person on his behalf, any remuneration whatever for providing him with employment, he shall for every such offense be deemed guilty of a misdemeanor and shall be imprisoned not more than six months or. fined not more than $500.''

he shall be entitled to full payment of wages earned. And when the voyage is ended every such seaman shall be entitled to the remainder of the wages which shall then be due him, as provided in section forty-five hundred and twenty-nine of the Revised Statutes: . . . *And provided further,* That this section shall apply to seamen on foreign vessels while in harbors of the United States, and the courts of the United States shall be open to such seamen for its enforcement.'"

This section and the others we have quoted express something more than particular relations of ship and seaman; they express the policy of the United States which no private conventions, no matter where their locality of execution, can be adduced to contravene. *The Kensington,* 183 U. S. 263; *United States v. Chavez,* 228 U. S. 525; *United States v. Freeman,* 239 U. S. 117. Nor are we called upon to assign the genesis of the policy or trace the evolution of its remedy to the act in controversy; and besides it has been done elsewhere. It is enough to say that the act itself demonstrates that it is intended as a means in the development of the merchant marine and it hardly needs to be added, to quote counsel for the Government, "that the welfare of the seaman is remarkably interrelated with that of the merchant marine." This certainly was the conception of Congress and answers the contentions based on contrary opinion and deductions. It is manifest also from the title of the act, which declares its purpose to be "To promote the welfare of American seamen in the merchant marine of the United States; to abolish arrest and imprisonment as a penalty for desertion and to secure the abrogation of treaty provisions in relation thereto; and to promote safety at sea." Its efficacy as a means or the policy of the means is not submitted to our judgment. Ours is the simple service of interpretation, and there is no reason to hesitate in its exercise because of supposed consequences. The policy

of the act was so insistent that Congress did not hesitate to abrogate opposing treaties. Certainly, therefore, we cannot give a controlling force to the suggestion that to construe the act as the ship construes it and others, supporting the ship, construe it, is to "impose our conception of the rights of seamen upon the whole world in violation of the comity of nations." The reply is immediate: It was for Congress to estimate this and other results and to consider how far they were counterpoised or overcome by other considerations. · If the section was ambiguous the asserted results might be invoked to resolve its meaning; but we do not think it is ambiguous.

It must be conceded, indeed, it is conceded, that the words of the sections are grammatically broad enough to include all seamen, foreign as well as American, and advances and contracts, wherever made, and to the contention that Congress had in mind and was only solicitous for American seamen, the answer is again immediate: The contention would take us from the certainty of language to the uncertainties of construction dependent upon the conjecture of consequences; take us from the deck to the sea, if we may use a metaphor suggested by our subject. Language is the safer guide, for it may be defined; consequences brought forward to modify its meaning may be in fact and effect disputed—foreseen, it may be, and accepted as necessary to the achievement of the purpose of the law. And the purpose is resolute, has been maintained for many years with increasing care, and the ship, being in the waters of the United States, not the nationality of the seamen, selected as its test. And lest there might be impediment in treaties, they are declared, so far as they impede, to be abrogated.

But authority may be adduced against the contentions. In *Patterson* v. *Bark Eudora, supra,* the Seamen's Act came under consideration, and it was contended, as it is contended now, that the title determined against the body

185. McKenna, Holmes, Brandeis, and Clarke, JJ., dissenting.

of the act and that therefore the act did not apply to foreign vessels notwithstanding its explicit words. The contention was declared untenable and the reasoning of the court exhausts discussion on that and the other contentions as to the purpose and power of Congress. Of the first it was said that it was to protect sailors against certain wrongs practiced upon them, one of the most common being the advancement of wages; of the second it was said, quoting Chief Justice Marshall: "The jurisdiction of the nation, within its own territory, is necessarily exclusive and absolute; it is susceptible of no limitation, not imposed by itself." *The Exchange,* 7 Cranch, 116. The nationality of the seamen does not appear, but the vessel was foreign, and the application of the statute to the latter constituted the ground of controversy.

Of course, the language of an act, though universal, may find limitation in the jurisdiction of the legislature; but certainly a ship within the harbors of the United States is within the jurisdiction of the United States, and making its exercise "apply to seamen on foreign vessels," and "the courts of the United States . . . . open to such seamen for its enforcement" was the judgment of Congress of the way to promote its purpose.

These considerations, we think, answer as well other contentions, that is, that the act "should be construed as applicable only to seamen shipped in an American port on vessels which remain for a time in or afterwards return to an American port to load or deliver cargo" or "to seamen of American nationality upon foreign or domestic vessels, irrespective of the port of shipment."

It is enough to say of the contentions, in addition to what has been said, that they impose on the statute qualifications and limitations precluded by its words and the purpose they express. There is a great deal said, and ably said, upon these contentions and the more pretentious one that the act would violate the Constitution of the

United States unless so "construed as not to apply to foreign seamen shipped on a foreign vessel in a foreign port, under a contract, valid where made . . . "

We cannot concede the qualification nor doubt the power of Congress to impose conditions upon foreign vessels entering or remaining in the harbors of the United States. And we think that the case of *The Eudora* declares the grounds of decision. Its principle is broader than its instance and makes the vessel and its locality in the waters of the United States the test of the application of the act and not the nationality of the seamen nor their place of shipment, nor contravening conventions, and precludes deductions of advances.

Nor is there obstacle in the penal provisions of the act. They may be distributively applied and such application has many examples in legislation. It is justified by the rule of *reddendo singula singulis.* By it words and provisions are referred to their appropriate objects, resolving confusion and accomplishing the intent of the law against, it may be, a strict grammatical construction. *United States* v. *Simms,* 1 Cranch, 252; *Commonwealth* v. *Barber,* 143 Massachusetts, 560; *Quinn* v. *Lowell Electric Light Corp.,* 140 Massachusetts, 106. The Seamen's Act especially invokes the application of the rule. The act applies to foreign vessels as explicitly and as circumstantially as it does to domestic vessels. Let the foreign vessel be in the waters of the United States and every provision of the act applies to it as far as it can apply. In other words, it gives the right to a seaman on a foreign vessel to demand from the master one-half part of the wages which he shall have earned at every port and makes void all stipulations to the contrary. And the remedy of the seaman in such case is made explicit. If his demand be refused ("failure on the part of the master to comply" are the words of the act) the seaman is released from his contract and he is entitled to the full payment of wages earned. And he is

185.               Syllabus.

given a remedy in the courts of the United States. The defense of an advance payment is precluded and clearance of the foreign vessel is forbidden. And thus the act has completeness of right and remedy and, we think, precludes judicial limitation of either. Its provisions are simple and direct, there is no confusion in their command, no difficulty in their obedience. Of course, a "master, owner, consignee, or agent of" any foreign vessel, to quote the words of the act again, cannot violate any provision of it if he be not in the United States. If there be provisions that cannot reach him, that with which this case is concerned can reach him.

We are, therefore, of opinion that the District Court was right in refusing to allow the Liverpool advances and the Circuit Court of Appeals was wrong in reversing the ruling.