JACKSON ET AL. *v.* S. S. "ARCHIMEDES."

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

No. 103.   Argued December 1, 1927.—Decided January 3, 1928.

1. Section 10 of the Dingley Act of 1884, as amended by the Seamen's Act of 1915, and the Merchant Marine Act of 1920, does not apply either expressly or by implication to advance wages paid by foreign vessels to foreign seamen while in ports of foreign countries whose laws sanction such payments.   P. 470.

2. When foreign seamen institute a libel in this country against a foreign vessel for wages due them, the master is entitled to deduct the advances made in the foreign country. P. 470.

11 F. (2d) 1000, affirmed.

CERTIORARI, 273 U. S. 679, to a decree of the Circuit Court of Appeals which affirmed a decree of the District Court, dismissing a libel *in rem* brought by British seamen for the purpose of collecting full wages without deduction of advances made in England.

*Mr. Silas B. Axtell,* with whom *Mr. John W. Davis* was on the brief, for petitioners.

*Mr. Roscoe H. Hupper,* with whom *Messrs. Van Vechten Veeder* and *William J. Dean* were on the brief, for respondent.

*Mr. Howard Thayer Kingsbury,* with whom *Mr. Frederic R. Coudert* was on the brief, as *amici curiae* by special leave of court, on behalf of the British Embassy.

MR. JUSTICE SANFORD delivered the opinion of the Court.

This case presents the question whether § 10 of the Dingley Act of 1884,[1] as amended by the Seamen's Act of 1915[2] and the Merchant Marine Act of 1920,[3] applies to the payment of advance wages to seamen on a foreign vessel in a foreign port.

The petitioners are British seamen, who shipped at Manchester, England, in May, 1922, on the *Archimedes,* a British vessel, for a round trip voyage to New York and return. When they signed the shipping articles they received advances on account of wages, which were cus-

---

[1] 23 Stat. 53, c. 121.

[2] 38 Stat. 1164, c. 153.

[3] 41 Stat. 988, c. 250; U. S. C., Tit. 46, c. 24.

tomary and sanctioned by the British law. On June 1, the vessel arrived in New York. On June 3, they applied for and received from the master further payments on account of wages which, with the advances made in England, exceeded one-half of the wages then earned and unpaid. On June 8, while still in port, they made a formal demand upon the master for one-half of the wages then earned and unpaid, disregarding the advances made in England. This having been refused, they left the vessel and filed this libel in the District Court, claiming that under R. S. § 4530 [4] they were entitled to the full wages earned at the time of the demand, without deducting the advances made in England, since these advances were invalidated by § 10 of the Dingley Act, as amended, and should be disregarded in computing the amount of wages due. On the hearing the court dismissed the libel on the ground that the Act does not prohibit advances to seamen on foreign vessels in foreign ports, and such advances cannot be treated as invalid and disregarded when wages are demanded in this country. 10 F. (2d) 234. This was affirmed by the Circuit Court of Appeals on the opinion of the District Judge. 11 F. (2d) 1000.

---

[4] This section was amended by § 31 of the Merchant Marine Act so as to read as follows: "Every seaman on a vessel of the United States shall be entitled to receive on demand from the master . . . one-half part of the balance of his wages earned and remaining unpaid at the time when such demand is made at every port where such vessel . . . shall load or deliver cargo before the voyage is ended, and all stipulations in the contract to the contrary shall be void: *Provided,* Such a demand shall not be made before the expiration of, nor oftener than once in five days nor more than once in the same harbor on the same entry. Any failure on the part of the master to comply with this demand shall release the seaman from his contract and he shall be entitled to full payment of wages earned. . . . *And provided further,* That this section shall apply to seamen on foreign vessels while in harbors of the United States, and the courts of the United States shall be open to such seamen for its enforcement."

To understand rightly the effect of the amendment made by the Merchant Marine Act of 1920—the controlling question in this case—it is necessary to consider first the amendment previously made by the Seamen's Act of 1915 and the decisions by this Court in reference thereto.

By § 11 of the Seamen's Act, Section 10 of the Dingley Act was amended so as to read as follows:

"Sec. 10 (a). That it shall be . . . unlawful in any case to pay any seaman wages in advance of the time when he has actually earned the same. . . . Any person violating any of the foregoing provisions of this section shall be deemed guilty of a misdemeanor, and upon conviction shall be punished by a fine . . . and may also be imprisoned. . . . The payment of such advance wages . . . shall in no case except as herein provided absolve the vessel or the master . . . from the full payment of wages after the same shall have been actually earned, and shall be no defense to a libel suit or action for the recovery of such wages. . . .

"(e) That this section shall apply as well to foreign vessels while in waters of the United States, as to vessels of the United States, and any master . . . of any foreign vessel who has violated its provisions shall be liable to the same penalty that the master . . . of a vessel of the United States would be for similar violation. The master . . . of any vessel of the United States, or of any foreign vessel seeking clearance from a port of the United States, shall present his shipping articles at the office of clearance, and no clearance shall be granted any such vessel unless the provisions of this section have been complied with."

It was held by this Court in *Sandberg* v. *McDonald*, 248 U. S. 185, 195 (1918), that § 11 of the Seamen's Act did not render invalid the contracts of foreign seamen as to the advance payment of wages made by a foreign vessel

in a foreign country in which the law sanctioned such contract and payment; and that when they made demand in this country for the payment of half wages, the master was entitled to deduct the advances made in the foreign country. In so holding, the Court said:

"Conceding for the present purpose that Congress might have legislated to annul such contracts as a condition upon which foreign vessels might enter the ports of the United States, it is to be noted, that such sweeping and important requirement is not found specifically made in the statute. Had Congress intended to make void such contracts and payments a few words would have stated that intention, not leaving such an important regulation to be gathered from implication. There is nothing to indicate an intention, so far as the language of the statute is concerned, to control such matters otherwise than in the ports of the United States. The statute makes the payment of advance wages unlawful and affixes penalties for its violation, and provides that such advancements shall in no cases, except as in the act provided, absolve the master from full payment after the wages are earned, and shall be no defense to a libel or suit for wages. How far was this intended to apply to foreign vessels? We find the answer if we look to the language of the act itself. It reads that this section shall apply to foreign vessels 'while in waters of the United States.'

"Legislation is presumptively territorial and confined to limits over which the law-making power has jurisdiction. *American Banana Co.* v. *United Fruit Co.,* 213 U. S. 347, 357. . . . We think that there is nothing in this section to show that Congress intended to take over the control of such contracts and payments as to foreign vessels except while they were in our ports. Congress could not prevent the making of such contracts in other jurisdictions. If they saw fit to do so, foreign countries

would continue to permit such contracts and advance pay-ments no matter what our declared law or policy in regard to them might be as to vessels coming to our ports.

" In the same section, which thus applies the law to foreign vessels while in waters of the United States, it is provided that the master . . . of any such vessel, who violates the provisions of the act, shall be liable to the same penalty as would be persons of like character in respect to a vessel of the United States. ` This provision seems to us of great importance as evidencing the legislative intent to deal civilly and criminally with matters in our own jurisdiction. Congress certainly did not intend to punish criminally acts done within a foreign jurisdiction; a purpose so wholly futile is not to be attributed to Congress. *United States* v. *Freeman*, 239 U. S. 117, 120. The criminal provision strengthens the presumption that Congress intended to deal only with acts committed within the jurisdiction of the United States."

On the same day, in *Neilson* v. *Rhine Shipping Co.*, 248 U. S. 205, it was likewise held, upon the same general considerations, that the Seamen's Act of 1915 did not make invalid advances that had been made to seamen by the master of an American vessel in a foreign port.

And later, in *Strathearn S. S. Co.* v. *Dillon*, 252 U. S. 348, 355 (1920), in distinguishing § 4 of the Seamen's Act—which in express terms declared that contracts denying seamen the right to demand half of their earned wages at ports reached in the course of a voyage, should be void, and gave seamen on foreign vessels while in American harbors the right to enforce its provisions in the courts of the United States [5]—from § 11 of the Act dealing with advance wages, this Court said: " In the case of *Sandberg* v.

---

[5] The provisions in § 4 of the Seamen's Act, which had amended R. S. § 4530, were the same in these respects as in the amendment made by the Merchant Marine Act which is set forth in Note 4, *supra.*

*McDonald* . . . we found no purpose manifested by Congress in § 11 to interfere with wages advanced in foreign ports under contracts legal where made. That section dealt with advancements, and contained no provision such as we find in § 4. Under § 4 all contracts are avoided which run counter to the purposes of the statute. Whether consideration for contractual rights under engagements legally made in foreign countries would suggest a different course is not our province to inquire. It is sufficient to say that Congress has otherwise declared by the positive terms of this enactment. . . ."

The libelants concede that under § 11 of the Seamen's Act, as interpreted by this Court in the *Sandberg* case, it would have been necessary to deduct the advances that had been made in England in computing the wages due them when the demand was made in this country, but insist that the law was thereafter changed in this respect by the amendment made by the Merchant Marine Act of 1920.

By § 32 of the Merchant Marine Act, Section 10 of the Dingley Act was further amended so as to make the third sentence of paragraph (a) dealing generally with advance payments, read as follows: "The payment of such advance wages . . . whether made within or without the United States or territory subject to the jurisdiction thereof, shall in no case except as herein provided absolve the vessel or the master . . . from the full payment of wages after the same shall have been actually earned, and shall be no defense to a libel suit or action for the recovery of such wages." This amendment made no change in any other part of paragraph (a), or in paragraph (e) referring to foreign vessels, which remained in full force.

The libelants contend that in making this amendment Congress intended to meet the effect of the decisions in both the *Sandberg* and *Neilson* cases, and to extend the

prohibition of advance wages to foreign vessels in foreign ports, as well as to American vessels in foreign ports.

We cannot sustain this contention. That this amendment expressed no intention to extend the provisions of the statute to advance payments made by foreign vessels while in foreign ports, is plain. This Court had pointed out in the *Sandberg* case that such a sweeping provision was not specifically made in the statute, and that had Congress so intended, " a few words would have stated that intention, not leaving such an important regulation to be gathered from implication." The amendment, nevertheless, not only contained no such specific statement, but made no reference whatever to foreign vessels;—left unchanged and in full force all of paragraph (e) which alone referred to foreign vessels, including the specific provision which, as held in the *Sandberg* case, indicated that the prohibition of advance wages was intended to apply to foreign vessels only while in waters of the United States;—made no change in the criminal provisions which strengthened the presumption that Congress intended to deal only with acts committed within the jurisdiction of the United States;—and merely inserted the phrase " whether made within or without the United States or territory subject to the jurisdiction thereof " in paragraph (a) which made no reference to foreign vessels. This phrase, read in the light of the context, is given full effect when applied to American vessels; and thus construed is entirely consistent with the provision in paragraph (e) relating to foreign vessels while in American waters. In short, the language of the amendment indicates no intention to extend the prohibition of the statute to advance wages paid by foreign vessels while in foreign ports. Nor can such an intention be " gathered from implication," or from anything in the legislative history of the amendment, in which no reference was made to foreign vessels.

The decree is                                    *Affirmed.*