BENZ ET AL. *v.* COMPANIA NAVIERA
HIDALGO, S. A.

No. 204.   Argued March 6, 1957.—Decided April 8, 1957.

*Kneland C. Tanner* argued the cause for petitioners. With him on the brief was *Richard R. Carney*.

*John D. Mosser* argued the cause for respondent. With him on the brief was *Lofton L. Tatum*.

MR. JUSTICE CLARK delivered the opinion of the Court.

While the petitioners in this diversity case present several questions, the sole one decided is whether the Labor Management Relations Act of 1947 [1] applies to a

---

[1] 61 Stat. 136, 29 U. S. C. § 141.

controversy involving damages resulting from the picketing of a foreign ship operated entirely by foreign seamen under foreign articles while the vessel is temporarily in an American port. We decide that it does not, and therefore do not reach other questions raised by the parties.

The S. S. *Riviera* on September 3, 1952, sailed into harbor at Portland, Oregon, for repairs, to load a cargo of wheat, and to complete an insurance survey. It was owned by respondent, a Panamanian corporation, and sailed under a Liberian flag. The crew was made up entirely of nationals of countries other than the United States, principally German and British. They had agreed to serve on a voyage originating at Bremen, Germany, for a period of two years, or until the vessel returned to a European port. A British form of articles of agreement was opened at Bremen. The conditions prescribed by the British Maritime Board were incorporated into the agreement, including wages and hours of employment, all of which were specifically set out. The crew further agreed to obey all lawful commands of the Master of the *Riviera* in regard to the ship, the stores, and the cargo, whether on board, in boats, or on shore.

On or about September 9, 1952, the members of the crew went on strike on board the vessel and refused to obey the orders of the Master. They demanded that their term of service be reduced, their wages be increased, and more favorable conditions of employment be granted.[2]

[2] The demands were first transmitted to the Master on September 7, 1952, by a person identifying himself as a delegate of the Sailors' Union of the Pacific. None of the crew belonged to that union. At 3 a. m. on September 8, 1952, the same party and some of the crew members called on the Master in his cabin. They demanded that he come to the crew's quarters and bargain with them on wages and conditions on the ship. This demand was refused. While claim was made that filthy conditions existed aboard and contaminated food was served, the court, after hearing evidence and personally inspecting the vessel, found to the contrary. There is no issue here as to these findings.

They refused to work, demanding their back pay and transportation or its cost to their ports of engagement. The Master told the crew to continue their work or they would be discharged. When they declined to work he discharged them and ordered them to leave the ship, which they refused to do. This situation continued until September 26, 1952, when the striking crewmen left the vessel pursuant to an order of the United States District Court entered in a possessory libel filed by the respondent. The crew had picketed the vessel from September 9, 1952, when the strike began, until September 26, when they left the ship. On September 15, 1952, they had designated the Sailors' Union of the Pacific as their collective bargaining representative. The striking crew or others acting for them continued the picketing from September 26, 1952, until they withdrew the picket line on October 13, 1952. The Sailors' Union of the Pacific began picketing the *Riviera* on October 14 and continued to do so until restrained by an injunction issued in an action for injunctive relief and damages filed against it and its principal representatives by the respondent. Two days later Local 90 of the National Organization of Masters, Mates and Pilots of America set up a picket line at the *Riviera* which was maintained until December 8, 1952. This picketing was stopped by a writ issued against that union and its representatives in the second action for injunction and damages filed by respondent and consolidated here. On December 10, 1952, another picket line was established at the vessel. It was maintained this time by the Atlantic and Gulf Coast District, S. I. U.,[3] until it too was enjoined on December 12 in a third action filed by the respondent in which the prayer likewise was for an in-

---

[3] None of the crew were members of any of the three unions involved in the intermittent picketing.

junction and damages. These three cases have been consolidated for consideration here. All of the picketing was peaceful.

The ship sailed in December 1952. In June 1953, the injunction orders were vacated on appeal to the Court of Appeals and were ordered dismissed as moot. The cases were returned to the District Court for trial on the damage claims. 205 F. 2d 944. The ship had not returned to an American port at the time of trial in 1954. At the trial the court found that the purpose of the picketing "was to compel the [respondent] to re-employ" the striking members of the crew for a shorter term and at more favorable wage rates and conditions than those agreed upon in the articles. The court further found that as a result of the picketing the employees of the firms repairing and loading the vessel refused to cross the picket line and the ship was forced to stand idly by without repairs or cargo, all to the damage of respondent. The unions and their representatives contended that the trial court was without jurisdiction because the Labor Management Relations Act had pre-empted the field. However, the trial court entered judgment for damages against the three unions as well as their principal representatives. The judgments were based on a common-law theory that the picketing was for an unlawful purpose under Oregon law. The court found that respondent had no remedy under the Labor Management Relations Act because that Act "is concerned solely with the labor relations of American workers between American concerns and their employees in the United States, and it is not intended to, nor does it cover a dispute between a foreign ship and its foreign crew." The Court of Appeals thought that *United Construction Workers* v. *Laburnum Construction Corp.*, 347 U. S. 656 (1954), governed, but that Oregon law did not permit recovery against the unions since they were unincor-

porated associations. 233 F. 2d 62.[4] This, in effect, left the judgments standing against the individual representatives of the unions, the petitioners here. We granted certiorari in order to settle the important question of jurisdiction posed. 352 U. S. 889.

It should be noted at the outset that the dispute from which these actions sprang arose on a foreign vessel. It was between a foreign employer and a foreign crew operating under an agreement made abroad under the laws of another nation. The only American connection was that the controversy erupted while the ship was transiently in a United States port and American labor unions participated in its picketing.

It is beyond question that a ship voluntarily entering the territorial limits of another country subjects itself to the laws and jurisdiction of that country. *Wildenhus's Case,* 120 U. S. 1 (1887). The exercise of that jurisdiction is not mandatory but discretionary. Often, because of public policy or for other reasons, the local sovereign may exert only limited jurisdiction and sometimes none at all. *Cunard S. S. Co.* v. *Mellon,* 262 U. S. 100 (1923). It follows that if Congress had so chosen, it could have made the Act applicable to wage disputes arising on foreign vessels between nationals of other countries when the vessel comes within our territorial waters. The question here therefore narrows to one of intent of the Congress as to the coverage of the Act.

The parties point to nothing in the Act itself or its legislative history that indicates in any way that the Congress intended to bring such disputes within the coverage of the Act. Indeed the District Court found to the contrary, specifically stating that the Act does not

---

[4] A cross-petition for certiorari was filed for a review of this question. The petition was denied. *Compania Naviera Hidalgo, S. A.,* v. *Benz,* 352 U. S. 890.

"cover a dispute between a foreign ship and its foreign crew." The Court of Appeals, though not passing on the question, noted that "It may well be that American laws should not be construed to apply, without some more explicit Congressional indication than we are able to find in the National Labor Relations Act, as amended, to situations with as many points of foreign contact as the situation at bar." 233 F. 2d, at 65.

Our study of the Act leaves us convinced that Congress did not fashion it to resolve labor disputes between nationals of other countries operating ships under foreign laws.[5] The whole background of the Act is concerned with

---

[5] Petitioners rely on two cases to bolster their argument that the Act applies to a foreign dispute such as the one here. We need only say that these cases are inapposite, without, of course, intimating any view as to their result. First petitioners seek support in *Sailors' Union of the Pacific, AFL and Moore Dry Dock Co.*, 92 N. L. R. B. 547 (1950). That case, however, was brought to the Board by an American employer, the owner of the drydock, claiming that the picketing by an American Sailors' Union was of the drydock and constituted a secondary boycott and therefore an unfair labor practice. The Board in its opinion gave no indication that it felt that the Taft-Hartley Act was intended to apply to a dispute involving employment aboard a foreign vessel. In fact, in a forerunner of that same case, *Compania Maritima Sansoc Limitada*, Case No. 20–RC–809, May 1, 1950, CCH NLRB Decisions, 1950–1951, ¶10,081, a petition to represent employees on a Panamanian vessel manned by foreign seamen, and owned by a Panama corporation, the majority of whose stockholders were citizens of foreign countries, was dismissed on the ground that the internal economy of a vessel of foreign registry and ownership was involved. The Board thus made it clear that it would not assume jurisdiction when a foreign vessel was involved. It did assume jurisdiction in the later dispute because that dispute was between an American employer and an American union.

The second case on which petitioners rely is *Norris Grain Co.* v. *Seafarers' International Union*, 232 Minn. 91, 46 N. W. 2d 94 (1950). There a suit for an injunction was brought by the American owner of a grain elevator in Duluth, Minn., charging an American union and its affiliate with a secondary boycott by picketing, not of a foreign ves-

industrial strife between American employers and employees. In fact, no discussion in either House of Congress has been called to our attention from the thousands of pages of legislative history that indicates in the least that Congress intended the coverage of the Act to extend to circumstances such as those posed here. It appears not to have even occurred to those sponsoring the bill. The Report made to the House by its Committee on Education and Labor and presented by the coauthor of the bill, Chairman Hartley, stated that "the bill herewith reported has been formulated as a bill of rights both for *American* workingmen and for their employers." The report declares further that because of the inadequacies of legislation "the *American* workingman has been deprived of his dignity as an individual," and that it is the purpose of the bill to correct these inadequacies. (Emphasis added.) H. R. Rep. No. 245, 80th Cong., 1st Sess. 4. What was said inescapably describes the boundaries of the Act as including only the workingmen of our own country and its possessions.

The problem presented is not a new one to the Congress. In the Seamen's Act of March 4, 1915, 38 Stat. 1164, the Congress declared it unlawful to pay a seaman wages in advance and specifically declared the prohibition applicable to foreign vessels "while in waters of the United States." *Id.*, at 1169, as amended, 46 U. S. C. § 599 (e). In *Sandberg* v. *McDonald*, 248 U. S. 185 (1918), this Court construed the Act as not covering advancements "when the contract and payment were made in a foreign country where the law sanctioned such contract and payment. . . . Had Con-

sel, but of the grain elevator. Though a Canadian union (affiliated with the American union) was joined as a defendant, the action ran between an American plaintiff-employer and an American defendant-union. There was no claim by the foreign vessel owner against a union.

gress intended to make void such contracts and payments a few words would have stated that intention, not leaving such an important regulation to be gathered from implication." *Id.*, at 195. The Court added that "such sweeping and important requirement is not found specifically made in the statute." *Ibid.* See also *Neilson* v. *Rhine Shipping Co.*, 248 U. S. 205 (1918). In 1920 Congress amended § 4 of the Seamen's Act of 1915, and granted to every seaman on a vessel of the United States the right to demand one-half of his then earned wages at every port the vessel entered during a voyage. 41 Stat. 1006, 46 U. S. C. § 597. The section was made applicable to "seamen on foreign vessels while in harbors of the United States, and the courts of the United States shall be open to such seamen for its enforcement." This Court in *Strathearn Steamship Co.* v. *Dillon*, 252 U. S. 348 (1920), upheld the applicability of the section to a British seaman on a British vessel under British articles. The Court pointed out:

> "taking the provisions of the act as the same are written, we think it plain that it manifests the purpose of Congress to place American and foreign seamen on an equality of right in so far as the privileges of this section are concerned, with equal opportunity to resort to the courts of the United States for the enforcement of the act. Before the amendment . . . the right to recover one-half the wages could not be enforced in face of a contractual obligation to the contrary. Congress, for reasons which it deemed sufficient, amended the act so as to permit the recovery upon the conditions named in the statute." *Id.*, at 355.

In 1928, *Jackson* v. *S. S. Archimedes*, 275 U. S. 463, was decided by this Court. It involved advance payments made by a British vessel to foreign seamen before leaving

Manchester on her voyage to New York and return. It was contended that the advances made in Manchester were illegal and void. That there was "no intention to extend the provisions of the statute," the Court said, "to advance payments made by foreign vessels while in foreign ports, is plain. This Court had pointed out in the *Sandberg* case [*supra*] that such a sweeping provision was not specifically made in the statute . . . ." *Id.*, at 470. Soon thereafter several proposals were made in Congress designed to extend the coverage of the Seamen's Act so as to prohibit advancements made by foreign vessels in foreign ports. A storm of diplomatic protest resulted. Great Britain, Italy, Sweden, Norway, Denmark, the Netherlands, Germany, and Canada all joined in vigorously denouncing the proposals.[6] In each instance the bills died in Congress.

And so here such a "sweeping provision" as to foreign applicability was not specified in the Act.[7] The seamen agreed in Germany to work on the foreign ship under British articles. We cannot read into the Labor Management Relations Act an intent to change the contractual

---

[6] 1 U. S. Foreign Rel.: 1928 at 830–838 (Dept. State 1942); *id.:* 1929 at 1005–1009 (Dept. State 1943); *id.:* 1931 at 808–814 (Dept. State 1946); *id.:* 1932 at 959–960 (Dept. State 1948).

[7] As far back as 1856 this Court was faced with a related problem. In *Brown* v. *Duchesne,* 19 How. 183 (1857), in construing our patent laws which were silent as to their coverage of foreign ships in our ports, the Court held that Congress had expressed no intention of subjecting the use of improvements on foreign vessels stopping at our ports to our patent laws. In this regard the Court said: "We think these laws ought to be construed in the spirit in which they were made—that is, as founded in justice—and should not be strained by technical constructions to reach cases which Congress evidently could not have contemplated, without departing from the principle upon which they were legislating, and going far beyond the object they intended to accomplish." *Id.*, at 197.

provisions made by these parties. For us to run interference in such a delicate field of international relations there must be present the affirmative intention of the Congress clearly expressed. It alone has the facilities necessary to make fairly such an important policy decision where the possibilities of international discord are so evident and retaliative action so certain. We, therefore, conclude that any such appeal should be directed to the Congress rather than the courts.

*Affirmed.*

MR. JUSTICE WHITTAKER took no part in the consideration or decision of this case.

MR. JUSTICE DOUGLAS, dissenting.

The case involves a contest between American unions and a foreign ship. The foreign ship came to Portland, Oregon, to load a cargo of wheat for carriage to India. The crew members were paid about one-third the amount of cash wages that are paid to American seamen on American vessels carrying grain to the Orient. This foreign ship is in competition with those American vessels.

American unions, therefore, have a vital interest in the working conditions and wages of the seamen aboard this foreign vessel. Their interest is in the re-employment of the foreign crew at better wages and working conditions. And they peacefully picketed the foreign vessel to further that interest.

The judgment we sustain today is one in damages against members of the American union who engaged in that peaceful picketing. It is for conduct precisely regulated by the Taft-Hartley Act.

If, as the District Court found, the purpose of the picketing was to prevent the repairing and loading of the foreign vessel, the question then arises whether the peace-

ful picketing was not a secondary boycott condemned by § 303 (a)(1) of the Act.

If the purpose of the peaceful picketing was to force the foreign vessels to bargain with one of the American unions without any of them being first certified as the representative of the seamen, the question arises whether that was not a violation of § 303 (a)(2) of the Act.

If either § 303 (a)(1) or § 303 (a)(2) was violated, then the injured person may sue in the federal courts for damages, as provided in § 303 (b). The Court bases its decision that the Act is inapplicable on the conclusion that the underlying controversy was between the foreign vessel and its crew. It intimates, however, that the Act would apply if this suit had been brought by the American independent contractors whose employees refused to cross the picket line, although the identical conduct by the American unions were involved. But, even if we assume *arguendo* that the foreign vessel would not be subject to the regulatory provisions of the Act, it could nonetheless sue under § 303 (b) to get protection from any unfair labor practice condemned by the Act. That is indeed the force of our ruling in *Teamsters Union* v. *New York, N. H. & H. R. Co.,* 350 U. S. 155, 160–161.

The Labor Board has asserted jurisdiction over unions that bring their pressures to bear on vessels of foreign registry (*In the matter of Sailors' Union of the Pacific,* 92 N. L. R. B. 547), at the same time that it has declined to assume jurisdiction over the foreign vessel.[1] *Id.,* at 560–561.

---

[1] The Sailors' Union of the Pacific picketed the main gate of a San Francisco shipyard, where a ship of foreign registry and ownership was undergoing repairs, after the owner of the vessel refused to recognize the union as exclusive representative of the crew. After the picketing began, the union filed, with the Board's Regional Office, a petition to be certified as the representative of the vessel's crew. As

If there is to be peace along the waterfront and a full and free flow of commerce as declared in § 1 of the Act, these American unions should be subject only to disciplinary action by the federal agencies to whom Congress has entrusted the job of law enforcement.[2]  Only by applying those centralized controls can we avoid the "diversities and conflicts likely to result from a variety of local procedures and attitudes toward labor controversies."  *Garner* v. *Teamsters Union,* 346 U. S. 485, 490.

There is no hiatus in the federal regulatory scheme as was true in *United Workers* v. *Laburnum Corp.,* 347 U. S. 656.  The facts alleged in the complaint, if true, might constitute unfair labor practices under the Act; and Congress has provided, as against American unions, both an

---

noted by the Court, the Board's Regional Director administratively dismissed the petition, "inasmuch as the internal economy of a vessel of foreign registry and ownership is involved."  The Board sustained the Regional Director's action on the ground that it had no jurisdiction over the foreign owner of the vessel.  The Board, however, assumed jurisdiction over an unfair labor practice complaint, issued against the union by the same Regional Director, charging that the picketing violated § 8 (b) (4) (A) of the Act.

[2] That was the conclusion of the Minnesota Supreme Court in a situation similar to this one.  An American union and a Canadian union picketed the dock of an American grain company to prevent the loading and unloading of vessels owned by a Canadian company, which had served notice that it would cease to recognize the Canadian union as bargaining representative for its crews.  In a suit by the grain company against both unions, the Minnesota Supreme Court concluded that the state courts had no jurisdiction over the dispute which was governed by the Federal Act.  "This action is directed not against the relationship between the Canadian Company and its employes or its relationship with the Canadian Union, but against acts of defendants done in the United States, and neither seeks to regulate the relationship between the Canadian Company and its employes or the Canadian Company and the Canadian Union."  *Norris Grain Co.* v. *Seafarers' International Union,* 232 Minn. 91, 109, 46 N. W. 2d 94, 104.

administrative remedy and a remedy by way of damages. I see no answer therefore to the conclusion that state law has been pre-empted by federal law within the meaning of our decision in *Weber* v. *Anheuser-Busch, Inc.,* 348 U. S. 468.

If American unions or their members are to be mulcted in damages for unfair labor practices affecting commerce, Congress has provided the way in which it shall be done.