**EMPRESA HONDURENA DE VA- PORES, S.A., Plaintiff- Appellant,**

**v.**

**Ivan C. McLEOD, Regional Director for the Second Region of the National Labor Relations Board, Defendant-Appellee,**

**National Maritime Union of America, AFL–CIO, Intervenor-Appellee.**

**No. 233, Docket 27314.**

United States Court of Appeals Second Circuit.

Argued Dec. 20, 1961.

Decided Jan. 12, 1962.

Orison S. Marden, New York City (White & Case), New York City, (Chester Bordeau and William D. Conwell, New York City, of counsel), for plaintiff-appellant.

Allan I. Mendelsohn, Washington, D. C. (Stuart Rothman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, National Labor Relations Board, Washington, D. C., and Samuel M. Kaynard, Regional Attorney, New York City), for defendant-appellee.

Herman E. Cooper, New York City, for intervenor-appellee.

Alfred A. Giardino, New York City, for United Fruit Co.

Before LUMBARD, Chief Judge, and FRIENDLY and MARSHALL, Circuit Judges.

FRIENDLY, Circuit Judge.

The complaint of Empresa Hondurena de Vapores, S.A., hereafter Empresa, against the Regional Director of the National Labor Relations Board, filed in the District Court for the Southern District of New York on December 12, 1961, made allegations which we summarize as follows:

(1) Empresa is a Honduran corporation, organized in 1941, with its principal office and place of business in Puerto Cortes, Honduras. It operates thirteen seagoing vessels, ten of which it owns and three of which are owned by Balboa

Shipping Company, Inc., a Panamanian corporation, which, like plaintiff, is a wholly owned subsidiary of United Fruit Company, a New Jersey corporation. All the vessels are registered under the laws of Honduras and fly the Honduran flag.

(2) The vessels are manned by unlicensed seamen, some 335 in number, all but one of whom are citizens of Honduras (the one being a British subject), employed in Honduras under Shipping Articles executed there. The vessels, all of which are time-chartered to United Fruit, ply between ports in Central and South America, the United States, Canada and Europe; all of them call regularly at Honduran ports for trade and renewal of Ship's Articles. Since 1941 the seamen have been represented by Sociedad Nacional de Marineros de Honduras, a Honduran labor union recognized by the Republic of Honduras, hereafter Marineros, as their collective bargaining agent. A collective bargaining agreement between Empresa and Marineros was made in 1957, to remain effective until April 15, 1959, and thereafter to be automatically renewed for successive two year terms in the absence of contrary notice; it now stands renewed until February 15, 1963. Honduras "has a long established and comprehensive system of laws and regulations governing all aspects of the ownership and operation of vessels registered in Honduras and the employment of personnel thereon"; under that law plaintiff is required to recognize Marineros as the exclusive bargaining agent of its unlicensed seamen, and labor grievances are handled by representatives of plaintiff and Marineros subject to the Ministry of Labor and the Labor Courts of Honduras.

(3) On November 15, 1961, the NLRB rendered a Decision and Direction of Election, 134 NLRB No. 25, which, as later modified, instructed the defendant Regional Director to conduct an election among plaintiff's seamen to determine whether they desired to be represented for collective bargaining purposes by National Maritime Union, AFL–CIO, by Sindicato Maritimo Nacional de Honduras ("Sindimar"), or by neither.[1] The Honduran Labor Code prohibits the exercise of functions by a union "so long as it does not have recognition of its juridic personality" or if its personnel is not at least 90% Honduran; National Maritime Union fails on both counts. Defendant has informed plaintiff that the election is to take place, beginning December 17, 1961, on board vessels arriving in United States ports between December 17, 1961 and January 31, 1962, and by mailing ballots to employees on vessels not so scheduled.

Alleging that the Board's direction violated Article 10 of the Treaty of Friendship, Commerce and Consular Rights between the United States and Honduras dated December 7, 1927, 45 Stat. 2618,[2] as well as the Constitution of the United States and principles of international law, plaintiff sought temporary and permanent injunctive relief. By order to show cause signed December 12, 1961, on an affidavit of counsel incorporating the allegations of the complaint, the motion for a temporary injunction was brought on for hearing before Judge Palmieri on December 14. The Regional Director moved to dismiss. He asserted that the District Court lacked jurisdiction over a direction for an election, that the request for relief was premature, that the members of the NLRB were indispensable parties defendant, and that in any event the Board's action was proper.

---

1. The Board's decision states that Marineros was notified the Board would grant it a right to intervene but did not reply.

2. This states:
 "Merchant vessels and other privately owned vessels under the flag of either of the High Contracting Parties, and carrying the papers required by its national laws in proof of nationality shall, both within the territorial waters of the other High Contracting Party and on the high seas, be deemed to be the vessels of the Party whose flag is flown."

Relevant to the last contention are certain additional facts stated in the Board's opinion and not challenged before us: United Fruit Company is predominantly United States owned. The bulk of its trade is between Central and South American countries which grow bananas and other tropical produce, and the United States. Empresa's officers are elected by its directors who are elected by United Fruit, and Empresa has always time-chartered all its vessels, almost entirely to United Fruit. However, Empresa "appears to function as a distinct corporate entity," and "There is nothing in the record to suggest that Empresa does not in fact carry out * * * typical responsibilities of the owner of a vessel under a time charter," including "hiring the officers and crews and handling all matters concerning terms and conditions of employment including payment of wages and discipline of the personnel."[3] On the other hand, United Fruit determines the routing of Empresa's ships, communicating its desires and complaints to the captain or to some other officer of Empresa. The vessels regularly call at United States ports, carrying United Fruit cargo on inbound and outbound voyages and also general cargo on the latter; some of the ships also carry passengers. Empresa's vessels are used by United Fruit in the same manner as other chartered or owned vessels registered under United States law.

It should be observed also that the Attorney General, acting at the request of the Departments of State and Defense, was permitted to appear as *amicus curiae* before the Board in this and related cases. Although the Attorney General's brief to the Board stated that it was not its "purpose * * * to support or oppose the position of the steamship companies or the position of the unions" (p. 2), it advanced (pp. 15–20) a list of proposed "principles to be applied in determining whether a vessel and its crew shall be deemed foreign

and thus beyond the scope of the Act," and "submitted * * * that the flag, as a ready, recognizable, and accepted standard must be preferred pragmatically to any other and that in accordance with that standard, the indirect financial interest of American citizens in a foreign registered ship may not deprive a vessel of its status as a national of the country whose flag is flown."

Despite the time pressure created by plaintiff's failure to bring this action until almost the eve of the scheduled election, Judge Palmieri prepared a thoughtful opinion, filed on December 16. Holding that the District Court had jurisdiction of the subject matter since, as he believed, plaintiff had made a colorable allegation of denial of constitutional rights, see Fay v. Douds, 172 F.2d 720, 723 (2 Cir. 1949), he nevertheless denied the injunction since he was not convinced of the probability of plaintiff's success or by its claims of irreparable damage from the election. He therefore deemed it unnecessary to decide at that time whether the members of the Board were indispensable parties.

Although a motion for a stay pending appeal was initially denied, the appeal itself was argued on December 20. Meanwhile the election had been stayed as the result of a temporary restraining order issued by the District Court for the District of Columbia in an action by Marineros against the members of the Board. The argument having convinced us that the case presented serious issues involving the relations of the United States with a foreign government and that no irreparable damage would be caused by a brief delay of the election, we then issued a stay pending determination of the appeal. We have reached a conclusion different from that of the District Judge.

Two other circumstances must be mentioned before we proceed further: Under date of December 15, 1961, the Department of State, through its Legal

---

3. In view of these and other specific findings of fact we consider the Board's statement that United Fruit is a "joint employer" to be an erroneous legal conclusion, which must be disregarded.

Adviser, forwarded to Judge Palmieri, without comment, a note dated November 29, 1961, from the Ambassador of Honduras, protesting against the board's decision, which was claimed to violate Articles 10 and 22 of the Treaty of Friendship, Commerce and Consular Rights,[4] to involve an intrusion by the United States into an area exclusively occupied by Honduras, and to infringe established principles of international law; the communication did not reach Judge Palmieri until December 18, after his decision had been filed. On January 10, 1962, the Department of Justice submitted to the District Court for the District of Columbia a letter saying that although the Department of State "does not support all the statements in the Honduran Note, it agrees with the conclusion that jurisdiction of the National Labor Relations Board should not attach in this case."

## I. The jurisdiction of the District Court.

 (1) Although the issue has not been raised, we must first consider whether the complaint, invoking 28 U.S. C. §§ 1331 and 1337, set forth a claim cognizable by a Federal district court, Mitchell v. Maurer, 293 U.S. 237, 244, 55 S.Ct. 162, 79 L.Ed. 338 (1934).

As subsequent discussion will show, the complaint advanced a claim arising under a treaty sufficient to come within § 1331, whether or not the claim was meritorious; the difficulty with respect to § 1331 is jurisdictional amount. When a plaintiff asserts the right to be free from regulation, "The value of that right may be measured by the loss, if any, which would follow the enforcement of the rules prescribed." McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 181, 56 S.Ct. 780, 781, 80 L.Ed.

1135 (1936). Here the complaint alleged that "the matter in controversy exceeds the value of $10,000, exclusive of interest and costs," but no facts were pleaded to substantiate this, and it is not obvious that an election alone would cause damage in that amount. Hence, if the allegation had been put in issue, as it was in the McNutt case and in K V O S, Inc. v. Associated Press, 299 U.S. 269, 57 S.Ct. 197, 81 L.Ed. 183 (1936), and plaintiff had not supported it, Federal jurisdiction under § 1331 could not be sustained. However, no such traverse was made and the allegation was not so clearly baseless that the court was bound to disregard it even in the absence of challenge, although the court "might, of its own motion, have entered upon an inquiry to ascertain whether the cause was one over which it had jurisdiction," K V O S, Inc. v. Associated Press, supra, at 277, 57 S.Ct. at 200.

 Moreover, we think the complaint asserted a claim under § 1337, giving district courts jurisdiction "of any civil action or proceeding arising under any Act of Congress regulating commerce * · * * ," without regard to the amount in controversy. The National Labor Relations Act is such an Act, American Federation of Labor v. Watson, 327 U.S. 582, 66 S.Ct. 761, 90 L.Ed. 873 (1946); Capital Service, Inc. v. N. L. R. B., 347 U.S. 501, 74 S.Ct. 699, 98 L.Ed. 887 (1954); the question is whether the action here is one "arising under" it. In support of a negative answer it could be said that what plaintiff is asserting is a right to be free from the Act, not a right allegedly conferred by it. But § 1337, like § 1331, speaks not of a claim created by, but of an action arising under, an act regulating commerce; it would run counter both

---

4. Article 22 provides that "A consular officer shall have exclusive jurisdiction over controversies arising out of the internal order of private vessels of his country, and shall alone exercise jurisdiction in cases, wherever arising, between officers and crews, pertaining to the enforcement of discipline on board, provided the vessel and the persons charged with wrongdoing shall have entered a port within his consular district. Such an officer shall also have jurisdiction over issues concerning the adjustment of wages and the execution of contracts relating thereto provided the local laws so permit."

to the language and to the policy underlying the statute to hold that the jurisdictional grant did not include an action whose sole purpose is to challenge an order of a Federal agency sought to be justified by a Federal statute. Whatever might earlier have been thought because of language in American Well Works Co. v. Lane & Bowler Co., 241 U.S. 257 260, 36 S.Ct. 585, 60 L.Ed. 987 (1916), the later decision in Smith v. Kansas City Title & Trust Co., 253 U.S. 180, 41 S.Ct. 243, 65 L.Ed. 577 (1921), seems to have crossed that bridge, see Association of Westinghouse Salaried Employees v. Westinghouse Electric Corp., 348 U.S. 437, 450, 75 S.Ct. 488, 99 L.Ed. 510 (1955); cases such as Louisville & Nashville R. R. v. Mottley, 211 U.S. 149, 29 S.Ct. 42, 53 L.Ed. 126 (1908), are distinguishable in that the action was to enforce a claim arising under state law, there a right under a contract, with the Federal statute a matter of defense, see also Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 672, 70 S.Ct. 876, 94 L.Ed. 1194 (1950), whereas here, as in Smith, it is the proposed application of the Federal statute alone that gives rise to the action. We do not pretend the distinction to be altogether clear or satisfying; but if one line of cases or the other has to be favored, considerations of good sense support those permitting the sphere of application of Federal statutes to be determined by Federal courts.[5]

▮ (2) The next problem as to the jurisdiction of the District Court is presented by the first two grounds of defendant's motion to dismiss, best considered together, namely, that the court has no power to enjoin an order for an election, especially at the suit of the employer, and that plaintiff's resort to the courts is premature.

5. Professor Mishkin believes it now to be settled "that an action for a judgment declaring the non-existence of such a federally created right in the other party also falls within the federal question statute." The Federal "Question" in the District Courts, 53 Colum.L.Rev. 157, 179 (1953).

We have not overlooked that the action here is against a Federal officer—a circumstance which one feels ought make a difference but apparently, under existing statutes, doesn't. Simply as a matter of language it might be argued that if jurisdiction under 28 U.S.C. § 1331 fails for lack of the required amount, the action would come within 28 U.S.C. § 1346 (a) (2) giving the district courts jurisdiction over "Any other civil action or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department * * *" But, apart from the inconsistency that one contention would assert the suit to be against the United States whereas the other would deny it, and the question whether § 1346 (a) (2), the successor of the Tucker Act, 24 Stat. 505 (1887), authorizes an injunction, see United States v. Jones, 131 U.S. 1, 9 S.Ct. 669, 33 L.Ed. 90 (1889); cf. Hatahley v. United States, 351 U.S. 173, 182, 76 S.Ct. 745, 100 L.Ed. 1065 (1956), the argument would fail on the basis that "where the officer's powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions." Larson v. Domestic and Foreign Commerce Corp., 337 U.S. 682, 689, 69 S.Ct. 1457, 1461, 93 L.Ed. 1628 (1949). An authority on the subject says, with respect to such suits against federal officers, that "Apart from situations where a method of judicial review is particularly prescribed by statute, the only grant of jurisdiction that includes such cases is that in matters 'arising under' the Constitution or the laws. This mode of treatment includes limitations, such as jurisdictional amount and the rule that federal questions must appear without anticipation of defenses, that have no place in actions against federal officials, which are necessarily of federal concern." Wechsler, Federal Jurisdiction and the Revision of the Judicial Code, 13 Law & Contemporary Problems 216, 220 (1948). Deering Milliken, Inc. v. Johnston, 295 F.2d 856, (4 Cir. 1961), might suggest that § 10(c) of the Administrative Procedure Act, 5 U.S.C.A. § 1009(c), could serve here as a special statutory provision such as Professor Wechsler mentions, but that would require us to decide whether the NLRB's direction of election constituted "final agency action" within the meaning of that Act.

In Local 1545, United Brotherhood of Carpenters, etc. v. Vincent, 286 F.2d 127 (2 Cir. 1960), we stated that District Court jurisdiction to enjoin Board directions in representation matters had been recognized in two types of cases, namely, (i) where plaintiff made an assertion, "not transparently frivolous," that failure to enjoin would deny rights guaranteed by the Constitution, Fay v. Douds, 172 F.2d 720, 723 (2 Cir. 1949), and (ii) where the Board had acted in plain contravention of a specific mandate of the Act, Leedom v. Kyne, 101 U.S.App.D.C. 398, 249 F.2d 490 (1957), aff'd 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958). The instant case does not come within the second exception; although we conclude that the Board erred, its error was far from "plain," International Ass'n of Tool Craftsmen v. Leedom, 107 U.S.App.D.C. 268, 276 F.2d 514, 516 (1960). Neither, with all respect to the learned District Judge, do we think it came within the first. Assuming as we do that the claim that the Board's action violated Article 10 of the 1927 Treaty with Honduras, see fn. 2, was "not transparently frivolous," a claim that such action violated any constitutional rights of plaintiff would be. For, apart from the uncertainty how far a treaty confers rights upon nationals of the foreign state as distinguished from the state itself, see American Law Institute, Restatement of the Foreign Relations Law of the United States, Tent. Draft No. 5, §§ 109 and 110; cf. Asakura v. Seattle, 265 U.S. 332, 44 S.Ct. 515, 68 L.Ed. 1041 (1924) and 28 U.S.C. § 1350, the Constitution does not prohibit Congress from legislating in violation of a treaty, The Cherokee Tobacco, 11 Wall. 616, 20 L.Ed. 227 (1870); Edye v. Robertson (Head Money Cases), 112 U.S. 580, 597–600, 5 S.Ct. 247, 28 L.Ed. 798 (1884), or directing its delegate to that end. On the other hand, the courts will not assume such a purpose on the part of Congress unless "clearly expressed," Cook v. United States, 288 U.S. 102, 119–120, 53 S.Ct. 305, 77 L.Ed. 641 (1933); Whitney v. Robertson, 124 U.S. 190, 194, 8 S.Ct. 456, 31 L.Ed. 386 (1888)—for one reason because such a violation would involve the United States in a claim for breach of its international obligation, Restatement of the Foreign Relations Law of the United States, Tent. Draft No. 3, § 128. Any benefit plaintiff takes from the Treaty thus goes to statutory interpretation, not to constitutional right.

However, the failure of the complaint to come within either of the categories of actions to enjoin representation orders that have heretofore been sustained is not fatal; the book has not been closed for all time. Leedom v. Kyne, supra, must be taken to have determined that, whatever may be the case with respect to orders of the National Mediation Board as to bargaining units, see Switchmen's Union, etc. v. National Mediation Board, 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed. 61 (1943); U N A Chapter, Flight Engineers International Ass'n v. National Mediation Board, 294 F.2d 905 (D.C.Cir. 1961), cert. denied, 82 S.Ct. 394 (1962), representation orders of the NLRB have not been vested with complete immunity from injunction, either by inferences from the National Labor Relations Act or on the principle of Myers v. Bethlehem Shipbuilding Corporation, 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638 (1938). Once that step has been taken, the courts must make up their minds, as best they can, whether in a particular type of case Congress would or would not have wished them to intervene against "agency action taken in excess of delegated powers," 358 U.S. at 190, 79 S.Ct. at 185. The considerations as to delay from judicial intervention, persuasively marshalled in Mr. Justice Brennan's dissent for Mr. Justice Frankfurter and himself in Leedom v. Kyne, supra, at 191–196, 79 S.Ct. at 180, argue for a negative answer in the usual case, having purely domestic significance, where the Board is alleged to have acted wrongly, although not plainly so; hence we gave such an answer in the Local 1545 case and in McLeod v. Local 476, 288 F.2d 198 (2

Cir. 1961), as the Court of Appeals for the District of Columbia has done in numerous cases cited in the Local 1545 opinion.[6] An altogether different situation is presented when, as here, there is a substantial claim that the Board is exceeding its jurisdiction in the field of foreign relations and is thereby offending a friendly foreign government; we cannot believe Congress would have wished to limit the role of the courts in that situation to cases where the Board had violated a "clear statutory command," Leedom v. Norwich, Connnecticut Printing Specialties and Paper Products Union, 107 U.S.App.D.C. 170, 275 F.2d 628, cert. denied, 362 U.S. 969, 80 S.Ct. 955, 4 L.Ed.2d 900 (1960), as against a command not so clear. Not only is the case in favor of judicial action stronger than in the typical domestic representation dispute, but the practical objections against it are weaker. Here the Board is entering a new and sensitive area of activity; while we do not assert that its jurisdiction with respect to foreign flag ships is to be decided on an all or nothing basis, the significant variations among the fact patterns are sufficiently few that guidelines ought soon be pricked out by the courts [7]— failing the more desirable solution of new legislation—and the problem will thus not be a constantly recurring one.

Assuming that the principle of Leedom v. Kyne may be thus extended in a proper case, two further problems must be faced. One is that here the suit is by the employer who, arguably, is sufficiently protected by the possibility of sitting out the election and certification, continuing to recognize the existing union, awaiting the filing of an unfair labor practice charge for so doing, and,

when held for this, bringing the direction of election before a court of appeals, as provided in § 9(d) of the Act, 29 U.S.C.A. § 159(d), on enforcement or review proceedings under § 10(f). The second is that, unlike Leedom v. Kyne, the instant action was brought to enjoin an election rather than a certification. See Cox, The Major Labor Decisions of the Supreme Court, October Term 1958, reprinted in Gellhorn and Byse, Administrative Law: Cases and Comments (1960 ed.), 441, 447–448.

An answer to the first point may be that, as shown in 73 Harv.L.Rev. 84, 219–220 (1959), the possibility of the plaintiff's precipitating an unfair practice charge was present in Leedom v. Kyne itself; yet the Court evidently did not deem this fatal. An answer to the second, in the circumstances here, is that, with Marineros not on the ballot, the situation was not one, such as in Local 1545, where a victory by a particular union at the polls might eliminate any need for resorting to the courts; here, whether the winner was N M U, Sindimar, or "no-union," plaintiff would suffer by being obliged to breach its contract with Marineros and, on the allegations of its complaint, to violate Honduran law by doing so. Sufficient though these answers may be, a more generally satisfying one is again the distinction between a case with international aspects and one without. If action ordered by the Board would trench on the jurisdiction of a foreign government contrary to the will of Congress, the best time to stop it is before the offense occurs, not somewhere along the line.

■ (3) The final problem as to the power of the District Court to entertain the action arises from the contention of

6. We take it that the point of the "plain contravention" requirement is to close the doors of the courts at the very outset to actions for injunctions in representation matters, which, though ultimately found unmeritorious, would have accomplished much of their objective by the very time required for judicial consideration. An inevitable corollary of the requirement is that a court must some-

times refuse to entertain a complaint asserting what it regards as a valid claim.

7. The Supreme Court has already granted certiorari, 368 U.S. 924, 82 S.Ct. 367 (1961), in a case involving one rather typical pattern, Incres Steamship Co., Ltd. v. International Maritime Workers Union, 10 N.Y.2d 218, 219 N.Y.S.2d 21 (1961).

the Regional Director [8] that the action must be dismissed since the members of the Labor Board were indispensable parties-defendant but were not named as such and could not have been served with process in the Southern District of New York and would have had a valid venue objection, 28 U.S.C. § 1391(b), if they had been.

So far as we have been able to determine, this precise question has not been squarely decided by any court of appeals. It has provoked differences of opinion in the district courts. In American Communications Ass'n, etc. v. Schauffler, 80 F.Supp. 400 (E.D.Pa.1948), a three-judge court with one judge dissenting, and in White v. Douds, 80 F.Supp. 402 (S.D.N.Y.1948), Chief Judge Ryan, held that the Board members were essential parties-defendant. In Local 1545, United Brotherhood of Carpenters v. Vincent, 187 F.Supp. 921 (S.D.N.Y.1960), Judge Dimock took a contrary view, citing Williams v. Fanning, 332 U.S. 490, 68 S.Ct. 188, 92 L.Ed. 95 (1947); in affirming his dismissal of the complaint on other grounds, we expressly did not pass upon that issue, 2 Cir., 286 F.2d at 129. Deering Milliken, Inc. v. Johnston, 295 F.2d 856 (4 Cir. 1961), lends support to Judge Dimock's position, although it involved the conduct of a hearing rather than of an election directed by the Board.

Williams v. Fanning, supra, upheld a suit to enjoin a postmaster from carrying out a fraud order of the Postmaster General. The rule there stated, 332 U.S. at 493–494, 68 S.Ct. at 189 is that "the superior officer is an indispensable party if the decree granting the relief sought will require him to take action, either by exercising directly a power lodged in him or by having a subordinate exercise it for him" but not "if the decree which

is entered will effectively grant the relief desired by expending itself on the subordinate official who is before the court"; it is immaterial, in the latter event, that the subordinate "would be left under a command of his superior to do what the court has forbidden." This would seem to carry the day for plaintiff save for defendant's contention that the Board is not required to have an election conducted by the regional director, citing § 102.69 of its Rules and Regulations—the implication being, we suppose, that a decree against the regional director would not "effectively" grant relief since the Board could circumvent the decree by ordering someone else to conduct the election. We need not consider whether a response that the Board could not do any such thing, since the decree would be res adjudicata, would be circular reasoning or not, see 3 Davis, Administrative Law Treatise (1958), pp. 602–603. For the Supreme Court, when confronted with an essentially similar contention with respect to the need for joining the Commissioner of Immigration and the Attorney General with the District Director in the review of a deportation order, deemed it enough to say, "But we need not decide the effect of such a judgment. We cannot assume that a decision on the merits in a court of appeals on a question of this kind, subject to review by this Court, would be lightly disregarded by the immigration authorities." Shaughnessy v. Pedreiro, 349 U.S. 48, 53, 75 S.Ct. 591, 595, 99 L.Ed. 868 (1955). Significant also, and quite applicable here, is the Court's statement in that case, "Undoubtedly the Government's defense can be adequately presented by the District Director who is under the supervision of the Commissioner." [9] We hold the members were not necessary parties.

8. The Board's order of November 15 provided: "The Regional Director * * * shall direct and supervise the election"; the supplemental order of December 5 provided "for the conduct of the election at the discretion of the Regional Director."

9. See Notes, Williams v. Fanning Revisited: The Indispensable Superior in Judicial Review of Administrative Actions, 54 Colum.L.Rev. 1128 (1954); The Doctrine of Indispensable Parties as Applied in Review of Administrative Action, 103 U. of Pa.L.Rev. 238 (1954).

## II. The power of the Board to direct an election.

Although the appeal is from denial of a temporary injunction, there appears to be no real dispute on factual matters. The case came before the District Judge on plaintiff's application for an injunction and the Board's motion to dismiss the complaint; hence we shall assume for the purposes of this opinion that the facts are as stated above, although the parties will be free to challenge them at a trial on final relief. The issue being one of law, the standard is whether we think the District Judge was wrong, not whether he was "clearly" so, Carroll v. American Federation of Musicians, etc., 295 F.2d 484, 488–489 (2 Cir. 1961), and cases cited.

The defendant's position proceeds from the basis that § 9(c) of the Act authorizes direction of an election if the Board has determined that "a question of representation affecting commerce exists"; that "affecting commerce" is defined by § 2(7), 29 U.S.C.A. § 152(7), to mean "in commerce, or burdening or obstructing commerce, or the free flow of commerce, or having led or tending to lead to a labor dispute burdening or obstructing commerce or the free flow of commerce"; and that § 2(6) defines commerce to include "trade, traffic, commerce, transportation or communication * * * between any foreign country and any State, Territory, or the District of Columbia." Literally the words cover the case. Yet the Board would hardly insist that the words apply to everything within their literal reach; we have not heard it suggested that the Board considers its power to extend to the stevedores who load Empresa's ships in Honduras although they are engaged in "commerce" quite as much as the seamen who man them. Neither do we suppose the Board would think it could direct an election among miners employed by a wholly owned subsidiary of an American company abroad, even though the ore was shipped to the United States and American employees of the parent were objecting to what they regarded as unfair wage competition arising from lack of effective organization among the foreign miners, although again the words literally apply. Words are not thus stretched to their literal bounds because statutes relating to international matters are construed in accordance with international usage, Lauritzen v. Larsen, 345 U.S. 571, 577–579, 581–582, 73 S.Ct. 921, 97 L.Ed. 1254 (1953); as was said in regard to another type of labor regulation, "An intention so to regulate labor conditions which are the primary concern of a foreign country should not be attributed to Congress in the absence of a clearly expressed purpose," Foley Bros., Inc. v. Filardo, 336 U.S. 281, 286, 69 S.Ct. 575, 578, 93 L.Ed. 680 (1949).

The problem of workers directly engaged in transportation is more difficult; the stevedores stay on the piers, the miners remain in the mines, but the seamen come to the United States and return. The Board is right in saying the scope of its power in respect of the latter is not to be determined by the simple notion that a Honduran registered ship is a floating piece of Honduran territory; that is a mere "figure of speech" whose fictitious character was exposed long ago, Wildenhus' Case, 120 U.S. 1, 7 S.Ct. 385, 30 L.Ed. 565 (1887); Cunard SS. Co. v. Mellon, 262 U.S. 100, 123–124, 43 S.Ct. 504, 67 L.Ed. 894 (1923).

Although Article 10 of the Treaty, which requires the United States to recognize Empresa's vessels as vessels of Honduras, also is not the end of our investigation, it surely must be the beginning. As was said with respect to the Jones Act in Lauritzen v. Larsen, 345 U.S. at 584–585, 73 S.Ct. at 929, "Perhaps the most venerable and universal rule of maritime law relevant to our problem is that which gives cardinal importance to the law of the flag" and, more generally, "the weight given to the ensign overbears most other connecting events in determining applicable law." How "cardinal" the importance is and how much "weight" should be given

must depend, in the absence of clear expression by Congress, on what other factors of foreign and United States interest are present, and on the nature of the United States statute sought to be applied, taking particular account of the danger that an attempt to apply our law may result in a collision with the foreign sovereign. In the Lauritzen case the single United States factor, that Larsen had joined the crew and signed the articles in New York, was adjudged insufficient to tilt the scale against the law of the flag. So also, in Romero v. International Terminal Co., 358 U.S. 354, 383–384, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959), the factor that the injury occurred in New Jersey. On the other hand, in Gerradin v. United Fruit Co., 60 F.2d 927 (2 Cir.), cert. denied, 287 U.S. 642, 53 S.Ct. 92, 77 L.Ed. 556, (1932), this court applied the Jones Act to the American demise-charterer of a Honduran registered vessel, as to an accident on the high seas to an American seaman hired in New York. See also the cases summarized in footnote 3 of the Lauritzen opinion, 345 U.S. at 573, 73 S. Ct. 97 and Bartholomew v. Universe Tankships, 263 F.2d 437 (2 Cir.), cert. denied, 359 U.S. 1000, 79 S.Ct. 1138, 3 L. Ed.2d 1030 (1959).

Decisions in regard to the application of United States statutes dealing with seamen's wages are perhaps more directly relevant to our problem. A provision of the Seamen's Act of 1915, making it unlawful to pay wages in advance, 38 Stat. 1164, 1169, 46 U.S.C.A. § 599(e), was held inapplicable "when the contract and payment was made in a foreign country where the law sanctioned such contract and payment," even though the statute specifically extended to "foreign vessels 'while in waters of the United States'," Sandberg v. McDonald, (the Talus) 248 U.S. 185, 194, 195, 39 S.Ct. 84, 86, 63 L.Ed. 200 (1918), see also Jackson v. Archimedes, 275 U.S. 463, 48 S.Ct. 164, 72 L.Ed. 374 (1928). On the other hand, the 1920 amendment of § 4 of the Seamen's Act, 41 Stat. 1006, 46 U.S.C.A. § 597, granting seamen on United States vessels the right to demand half of their earned wages at every port and making the section applicable to "seamen on foreign vessels while in harbors of the United States," was construed to cover the suit of a British seaman on a British vessel under British articles in the light of a further provision that "the courts of the United States shall be open to such seamen for its enforcement," Strathearn SS. Co. v. Dillon, 252 U.S. 348, 40 S.Ct. 350, 64 L.Ed. 607 (1902),[10]

It is with this background that we come to Benz v. Compania Naviera Hidalgo, S. A., 353 U.S. 138, 77 S.Ct. 699, 1 L.Ed.2d 709 (1957). It involved the SS. Riviera, owned by a Panamanian corporation, sailing under the Liberian flag, and manned by a foreign crew, principally German and British, who had signed a British form of articles at Bremen, Germany. While the Riviera was in Portland, Oregon, loading a cargo of wheat destined for India, crew members struck because of a wage dispute, and picketed the vessel. The picketing was later continued by three American unions. The shipowner's action, in which federal jurisdiction was predicated on diverse citizenship, sought damages from these unions and their representatives, under Oregon law. The defense was that the Labor Management Relations Act had preempted the field; the Supreme Court

10. The Court thought "the provisions of the act as the same are written" made plain "the purpose of Congress to place American and foreign seamen on an equality of right in so far as the privileges of this section are concerned * * *" 252 U.S. at 355, 40 S.Ct. at 352. An abundance of legislative material leading to the same conclusion is summarized in the opinion that Mr. Justice Brandeis had prepared for possible delivery, see Bickel, The Unpublished Opinions of Mr. Justice Brandeis pp. 35, 47 ff., reprinted in 69 Harv.L.Rev. 1177, 1190 ff. (1956), and Monteiro v. Sociedad Maritima San Nicolas, S.A., 280 F.2d 568, 573–574 (2 Cir.), cert. denied, 364 U.S. 915, 81 S.Ct. 272, 5 L.Ed.2d 228 (1960).

held the defense unfounded. The opinion, by Mr. Justice Clark, stated, 353 U.S. at 143, 77 S.Ct. at 702:

"Our study of the Act leaves us convinced that Congress did not fashon it to resolve labor disputes between nationals of other countries operating ships under foreign laws. The whole background of the Act is concerned with industrial strife between American employers and employees."

Mr. Justice Douglas dissented on the ground that "The case involves a contest between American unions and a foreign ship"; that since the foreign ship was in competition with American vessels paying higher wages, "American unions * * * have a vital interest in the working conditions and wages of the seamen aboard this foreign vessel"; that the picketing, on American soil, either was or was not a violation of § 303(a) (1) or (2) of the Taft-Hartley Act, 29 U.S.C.A. § 187(a) (1, 2); that "even if we assume *arguendo* that the foreign vessel would not be subject to the regulatory provisions of the Act, it could nonetheless sue under § 303(b) to get protection from any unfair labor practice condemned by the Act"; hence Congress had occupied the field, 353 U.S. at 147–150, 77 S.Ct. at 705. The only subsequent Supreme Court decision in this area is Marine Cooks, etc. v. Panama S.S. Co., 362 U.S. 365, 80 S.Ct. 779, 4 L.Ed.2d 797 (1960). The holding, that the Norris-LaGuardia Act, 29 U.S.C.A. §§ 101, 104, deprived a district court of jurisdiction to enjoin an American union from picketing, on American soil, a Liberian ship owned by one Liberian corporation and time-chartered to another and manned by a foreign crew, is without direct application to the problem here. No conflict with foreign governments or foreign laws is caused if Congress chooses to stay a Federal court from enjoining the picketing in the United States of a foreign flag ship involved in a labor dispute, as it did in the case of ships under our own flag until 1947 and still does so far as private suits are concerned, see A. H. Bull S.S. Co. v. Seafarers' Int'l Union, 250 F.2d 326 (2 Cir. 1957). Hence the Court's conclusion that Congress intended the Norris-LaGuardia Act to apply in such a case does not support an inference that Congress intended the same with respect to the National Labor Relations Act—just as it does not show the contrary. However, in disapproving the Court of Appeals' reliance on Benz in reaching a contrary result, the Supreme Court said, 362 U.S. at p. 369, 80 S.Ct. at p. 783:

"The question in the Benz case was whether the Labor Management Relations Act of 1947, 29 U.S.C.A. § 141 et seq., governed the internal labor relations of a foreign ship and its foreign workers under contracts made abroad while that ship happened temporarily to be in American waters. The Benz case decided that the Labor Management Relations Act had no such scope or coverage and that it accordingly did not preempt the labor relations field so as to bar an action for damages for unlawful picketing under Oregon Law."

The Board seeks to distinguish Benz on the ground that it involved no such indirect American ownership and no such regular coming and going from American ports as here. The "labor disputes between nationals of other countries operating ships under foreign laws," there said not to be covered by the Act, would thus not include a dispute where the employer was a wholly-owned subsidiary of an American corporation, also operating ships under our own flag, even when as here the subsidiary had been formed long before controversy arose and none of the ordinary bases for piercing the corporate veil exist, see In re Gibraltor Amusements, Ltd., 291 F. 2d 22 (2 Cir.), cert. denied, Gibraltor Amusements Ltd., v. Wurlitzer Company, 82 S.Ct. 360 (1961). Stress is laid upon the sentence in the Benz opinion, "The only American connection was that the controversy erupted while the ship was transiently in a United States port and

American labor unions participated in its picketing," 353 U.S. at 142, 77 S.Ct. at 701, and upon the reference to "temporarily" in Marine Cooks. As against these respects in which the instant case is stronger than Benz for the application of the Labor Act, there is at least one in which it may be weaker. As Mr. Justice Douglas pointed out in his dissent, the Benz case did not directly involve the application of the panoply of labor regulation embodied in §§ 7, 8, 9 and 10, but only the provisions of § 303 of the Taft-Hartley Act relating to picketing, there wholly on American soil; it is hard to believe that foreign governments would be, or under international practice would have any right to be, concerned with whether the rights of their ships to damages for such picketing were governed by Federal or state law.[11] Here, on the other hand, application of §§ 7, 8, 9 and 10 of the National Labor Relations Act would involve the risk of continuous conflict between the United States and Honduras with respect to labor conditions which, though of more interest to the United States than those in Benz, are still Honduras' "primary concern," 336 U.S., at 286, 69 S.Ct. 575.

▌ The case made by plaintiff's complaint goes far beyond the flying of the Honduran flag, important as Lauritzen teaches that to be. In this case there are also the Honduran citizenship of the crews, the employment of the crews in Honduras under Honduran articles, the vessels' regular visits to Honduras, the Honduran corporate identity—admittedly not fictitious—of the owner, the long recognition of and contract with a Honduran union, and the provisions of Honduran law regulating labor matters. Though the vessels are engaged in the foreign commerce of the United States,

they are also engaged in the foreign commerce of Honduras. The only United States contacts not matched by Honduran ones are United Fruit's stock ownership and its direction and use of the voyages; these are substantially outweighed, for the purpose here at issue, by Honduras' interests.

Although the application of the Jones Act to accidents on foreign registered vessels involves the probability of rules of liability and amounts of recovery different from the law of the flag, as the discussions in Lauritzen, 345 U.S. at 575–576, 73 S.Ct. 97 and in Romero, 358 U.S. at 358, 79 S.Ct. 468 show, imposition of United States law on the rights of a seaman to recover against a ship owner or operator for personal injury is not likely to involve either party in a breach of contract with a third person or in the violation of a foreign governmental requirement. The occasional application of the antitrust laws to activities abroad has not been without its problems, see British Nylon Spinners, Ltd. v. Imperial Chemical Industries, Ltd., [1952] 2 All E. R. 780, 782, 784; United States v. Holophane Co., 352 U.S. 903, 77 S.Ct. 144, 1 L.Ed.2d 114 (1956), even though the activity is usually of relatively small significance to the total economy of the foreign land. Here, on the allegations of the complaint, the conflict between United States and Honduran law would be constant;[12] far from dealing only with incidents while the ships were in American waters, the Board would be regularly applying the shifting standards of its own decisions, and those of American courts and American legislators, to conduct in Honduras, where the bargaining between Empresa and its employees has always taken place;[13] it would be endeavoring to en-

---

11. However, the Court may have thought that the liabilities imposed on unions by § 303 and the rights conferred by §§ 7, 8, 9 and 10 must be regarded as a single package, see Note, The Effect of United States Labor Legislation on the Flag-of-Convenience Fleet, 69 Yale L.J. 498, 518–519 (1960).

12. See the discussion in 69 Yale L.J. 498, 514–515 (1960).

13. A wryly amusing illustration is furnished by the Board's explanation, in its opinion in this very case, fn. 23, that the existing collective bargaining agreement between Empresa and Marineros "is not a bar to this proceeding, assuming it

force its will on matters that Honduras, with a better claim, regards as for itself to decide. Compare Vanity Fair Mills v. T. Eaton Co., Ltd., 234 F.2d 633, 646–647 (2 Cir.), cert. denied, 352 U.S. 871, 77 S.Ct. 96, 1 L.Ed.2d 76 (1956). The situation here differs sharply from the United States' informing itself as to contracts relating to the movement of traffic between the United States and a foreign country, Kerr SS. Co. v. United States, 284 F.2d 61 (2 Cir. 1960); Montship Lines, Ltd. v. Federal Maritime Board, 295 F.2d 147, 153 (D.C.Cir. 1961), or even taking action with respect thereto, Thomsen v. Cayser, 243 U.S. 66, 37 S.Ct. 353, 61 L.Ed. 597 (1917). The case is appropriate for application of Mr. Justice Jackson's warning that "in dealing with international commerce we cannot be unmindful of the necessity for mutual forbearance if retaliations are to be avoided; nor should we forget that any contact which we hold sufficient to warrant application of our laws to a foreign transaction will logically be as strong a warrant for a foreign country to apply its law to an American transaction," 345 U.S. at 582, 73 S.Ct. at 928. We realize that if the Labor Act is inapplicable, owners of foreign flag ships such as Empresa will be deprived of the protection against certain unfair labor practices by the Federal courts accorded employers subject to the Act by such provisions as § 10(l) and § 303; but the practical consequences of this are less serious than those of a contrary

holding. At least so the owners think, with the apparent concurrence of the Supreme Court in Benz.

Our belief that the Labor Act should not be held applicable in a case such as this is reinforced by the Geneva Convention on the High Seas, ratified by the United States on March 24, 1961, but not yet effective for lack of required ratification by 22 nations. Article 5, § 1, of the Convention reads:

> "Each State shall fix the conditions for the grant of its nationality to ships, for the registration of ships in its territory, and for the right to fly its flag. Ships have the nationality of the State whose flag they are entitled to fly. There must exist a genuine link between the State and the ship; in particular, the State must effectively exercise its jurisdiction and control in administrative, technical and social matters over ships flying its flag."

Discussion seems to have been centered on what happens if the "genuine link" does not exist;[14] neither the text nor such explanatory materials as we have found say specifically what happens if the conditions of the final sentence are met. Yet, since it was deemed so important to insist upon the existence of a "genuine link" and the flag state's effective exercise of "jurisdiction and control in administrative, technical and social matters over ships flying its flag," it would be unreasonable to conclude that

---

would otherwise be so effective, because the decision herein is issuing after the expiration date of that contract. See: St. Louis Independent Packing Company, 122 NLRB 887, 889." One wonders how fully the Labor Court of Honduras is informed about the NLRB's "contract-bar" rule.

14. The "genuine link" requirement as adopted was less stringent than proposals made by such governments as the United Kingdom and the Netherlands and by the International Labor Conference, "which would have enabled states other than the flag state to withhold recognition of the national character of a ship if they con-

sidered that there was no 'genuine link' between the state and the ship." Report of the Committee on Foreign Relations to the Senate, 106 Cong.Rec. 10382 (1960). The Senate was told that the effect of the language as adopted in Geneva is that "no state can claim the right to determine unilaterally that no genuine link exists between a ship and the flag state," but "Nevertheless, there is a possibility that a state, with respect to a particular ship, may assert before an agreed tribunal, such as the International Court of Justice, that no genuine link exists. In such event, it would be for the Court to decide whether or not a genuine link existed." Id.

when all this had been done other states do not owe some obligations of respect.[15]

Three other matters ought be mentioned before we conclude:

(1) We have not discussed the conflicting contentions as to the effect of Article 22 of the Treaty with Honduras, quoted in footnote 4—plaintiff arguing that application of the Labor Act would violate the first clause, particularly in the light of the Supreme Court's statement in Marine Cooks quoted above, and defendant contending that the matter is one of "the execution of contracts" as to which the final sentence permits the application of "local laws." The problem is not an easy one; the view we take of the instant case makes it unnecessary for us to decide it.

(2) We realize that American unions understandably desire to organize vessels which they conceive to be in substance a part of this country's merchant marine, and that attempts to implement that desire can lead to a breach of the industrial peace which the Board is bound to promote, particularly when, as here, the stockholder of the foreign flag ships operates American flag vessels as well. Last summer's strike of the American merchant marine, with which we have some familiarity, see United States v. National Marine Engineers Beneficial Ass'n., 294 F.2d 385 (2 Cir. 1961), sufficiently demonstrates this. Therefore, we recognize that a controversy between an American union and Empresa could lead or tend to lead "to a labor dispute burdening or obstructing commerce or the free flow of commerce" carried on by American flag ships, as well as directly obstructing commerce carried on by foreign ones. However, that scarcely is decisive—the question still is how far Congress intended to permit the Board to intervene in what would normally be the affairs of a foreign government in order to prevent this. Even if we were to make the unrealistic assumption that Congress was so far-seeing as not only to have contemplated the growth of flags of convenience when it adopted the Labor Act in 1935,[16] but also to have anticipated cases where an American company would operate some ships under our own flag and others through foreign subsidiaries flying the flags of other countries, we see no basis for believing Congress would have chosen to solve the problem by an exercise of jurisdiction which would create such a conflict with a foreign government as would seem inevitable here. Mr. Justice Clark's statement in Benz, 353 U.S. at 147, 77 S.Ct. at 704, seems exceedingly apposite:

"For us to run interference in such a delicate field of international relations there must be present the affirmative intention of the Congress clearly expressed. It alone has the faculties necessary to make fairly such an important policy decision where the possibilities of interna-

15. Although the Geneva Convention has not yet become effective, a convention representing such a consensus of thought by the leading maritime nations should be given weight by a United States court as evidence of international practice, especially after ratification by this country.

16. The use of "flags of convenience" by United States' enterprises is said to have begun in an effort to make what had been American ships available for the transportation of needed cargoes to powers resisting Nazi aggression despite the Neutrality Act of 1939, 54 Stat. 4, 22 U.S.C.A. § 441 et seq., 6 Benedict, Admiralty (1958), 219–220; Note, Pan-Lib- Hon Registration of American-Owned Merchant Ships: Governmental Policy and the Problem of the Courts, 60 Colum. L.Rev. 711, fn. 1 (1960). It has continued for economic reasons. See Note, The Effect of United States Labor Legislation on the Flag-of-Convenience Fleet, 69 Yale L.J. 498 (1960). The letter of the Secretary of Defense attached to the Attorney General's brief to the NLRB indicated that, as of 27 September 1960, the deadweight tanker tonnage available to the United States under "Panlibhon" (Panama, Liberia, Honduras) registry was some 120%, and the general cargo tonnage some 40%, of the United States flag tonnage.

tional discord are so evident and retaliative action so certain." [17]

(3) In order to avoid any possible misunderstanding in this controversial area, we emphasize that we are deciding only the case before us; what the result should be when the contacts of the country of the flag are weaker relative to those of the United States than here, we do not say.[18]

The order denying a temporary injunction is reversed.

17. The Secretary of Labor has announced the creation of a three-man review board to study the flag of convenience controversy, N. Y. Times, Sept. 20, 1961, p. 47, col. 6.

18. The Board decisions include West India Fruit and Steamship Co., Inc., 130 NLRB No. 46, an unfair labor practice case now pending, on petition to review, in the Fifth Circuit; Peninsular & Occidental SS. Co., 132 NLRB No. 1, also an unfair labor practice case; Eastern Shipping Corp., 132 NLRB No. 72, and Hamilton Bros., Inc., 133 NLRB No. 85, both representation cases. Navios Corp. v. National Maritime Union, 402 Pa. 325, 166 A.2d 625 (1960), cert. denied, 366 U.S. 905, 81 S.Ct. 1047, 6 L.Ed.2d 204 (1961), and Incres Steamship Co., Ltd. v. International Maritime Workers Union, 10 N.Y.2d 218, 219 N.Y.S.2d 21, cert. granted, 368 U.S. 924, 82 S.Ct. 367 (1961), involved the applicability of state laws with respect to picketing, as against claims of federal preemption.