303 F.2d 369
 The BOWATER STEAMSHIP COMPANY, Ltd., Plaintiff-Appellant,
v.
Earl PATTERSON, individually and as Secretary of
International Woodworkers ofAmerica, AFL-CIO, John Doe,
Richard Roe and John Roe, being fictitious, thereal names of
the defendants being unknown to this plaintiff, said
fictitiousnames beingintended to designate the pickets in
the vicinity of the plaintiff's MotorVessel THE GLADYS
BOWATER, Defendants-Appellees.
 No. 176, Docket 26744.
 United States Court of Appeals Second Circuit.
 Argued Jan, 11, 1962.
Decided March 28, 1962.
 
 William D. Carle, McCreary, Hinslea & Ray, Cleveland, Ohio, for plaintiff-appellant.
 Thomas P. McMahon, McMahon & Crotty, Buffalo, N.Y., for defendants-appellees.
 Before LUMBARD, Chief Judge, and CLARK and FRIENDLY, Circuit Judges.
 FRIENDLY, Circuit Judge.
 
 
 1
 The facts, stipulated or testified, include the following:
 
 
 2
 Plaintiff, The Bowater Steamship Company, Ltd., an English corporation, owns the M/V Gladys Bowater, a British registered ship. Plaintiff is owned by Bowater Paper Company, Limited, an English corporations, which also owns The Bowater Corporation of North America, Limited, a Canadian corporation, which, in turn, owns Bowater's Newfoundland Pulp and Paper Mills, Limited, a Canadian corporation. Bowater's Newfoundland operates pulp and paper mills in the Province of Newfoundland, where it has timber lands and licenses to timber rights and lands owned by others. Bowater's Newfoundland sells its paper to a subsidiary, Newfoundland Export and Shipping Company, Limited, which in turn sells some of it to Bowater Paper Company, a New York corporation owned by Bowater Corporation of North America, which sells to consumers in the United States. Paper thus sold is transported by seven British registered vessels, including the Gladys Bowater, owned by plaintiff and chartered by it to Bowater's Newfoundland.
 
 
 3
 International Woodworkers of America, hereafter IWA, whose secretary and certain of whose members were named as defendants, is a labor organization with officers and members in the United States and Canada. Beginning late in 1956, IWA sought to organize employees of contractors in Newfoundland who were cutting timber for Bowater's Newfoundland and also employees of Anglo-Newfoundland Development Company, a competing concern with which Bowater's had no corporate affiliation but which had at one time joined with Bowater's in 'joint and common labor agreements' covering the woods employees. The Newfoundland Labor Relations Board certified IWA as collective bargaining agent for the employees of Anglo-Newfoundland and of some of the Bowater contractors.
 
 
 4
 Bargaining by IWA with Anglo-Newfoundland and with the Bowater contractors having failed to product an agreement, and Anglo-Newfoundland having refused to accept an award by the Newfoundland conciliation service, the IWA called a strike in December, 1958. The strike affected virtually all of Anglo-Newfoundland's lumbering operations. Bowater's announced it would supply Anglo-Newfoundland with plupwood and did so; this led to a strike by the workers of contractors on Bowater lands. The strike was characterized by violence; a new union was formed, at the urging of the Premier of the Province. Thereupon Anglo-Newfoundland and Bowater issued a joint statement that 'Under no circumstances * * * will A.N.D. and Bowater sign any agreement with the I.W.A.,' and that if the companies' wood supplies became exhausted through IWA's efforts, they would shut down their mills. On March 6, 1959, the Newfoundland House of Assembly adopted 1959 Trade Union (Emergency Provisions) Act No. 2. This revoked the certification of 'each trade union named in the schedule to this Act,' to wit, Locals 2-254 and 2-255 of IWA' invalidated any agreements made with any such union; and provided that any such union shall not apply for certification, and that the Labor Relations Board shall not grant certification, without the consent of the Lieutenant-Governor in Council.
 
 
 5
 In July, 1959, the Gladys Bowater sailed from Newfoundland with a cargo including newsprint destined for two Buffalso papers. The newsprint had been sold to Bowater Paper Company of New York, which resold it to the users. The officers and crew of the Gladys Bowater were British nationals, hired under British articles and represented by British labor organizations. On her arrival in Buffalo on August 3, a picket appeared at the dock with a sign reading 'S.S. Gladys Bowater Unfair to Organized Labor, International Woodworkers of America, AFL-CIO.' The longshoremen who had been engaged to unload her cargo refused to do so.
 
 
 6
 Plaintiff then began this action in the Western District of New York, alleging jurisdiction under 28 U.S.C. 1331, in general terms, and seeking temporary and permanent injunctive relief and damages. A temporary restraining order was issued on August 6, 1959, without a hearing. The picketing ceased; the Gladys was unloaded and sailed on August 8. However, plaintiff pressed the motion for a temporary injunction because of the likely resumption of picketing on further voyages of the Gladys or other Bowater vessels. November 4, 1959, Judge Burke concluded that plaintiff was entitled to a preliminary injunction and directed that a decree by settled on notice; however, none was presented. After the Supreme Court's decision, on April 18, 1960, in Marine Cooks & Stewards, A.F.L. v. Panama S.S. Co., 362 U.S. 365, 80 S.Ct. 779, 4 L.Ed.2d 797, the judge called for briefs and further argument. He concluded, on September 15, 1960, that, under that decision, the Norris-LaGuardia Act, 29 U.S.C.A. 101-115, deprived him of jurisdiction to grant an injunction. The appeal is from that ruling, 28 U.S.C. 1292(a)(1); we affirm.
 
 
 7
 Since inquiry at the argument revealed that picketing of plaintiff's vessels has not been resumed despite the denial of a temporary injunction more than a year ago, we have considered whether we ought decline to pass upon the thorny issue decided by the District Judge. Plainly defendant's failure to resume picketing does not require us to dismiss plaintiff's appeal as moot; 'voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case,' United States v. W. T. Grant Co., 345 U.S. 629, 632, 73 S.Ct. 894, 97 L.Ed. 1303 (1953), and cases cited. Still, as was there said, in order to obtain an injunction, or, we should suppose, to warrant a remand for the issuance of one, 'the moving party must satisfy the court that relief is needed'-- there must be 'some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive.' 345 U.S. at 633, 73 S.Ct. at 898. Here, upon our inquiry at the argument, the defendants, far from disclaiming intention to repeat the allegedly illegal conduct, indicated they might well resume picketing unless our decision should indicate that this would be enjoined. Hence we cannot properly affirm on the simple basis that no need for an injunction now appears.
 
 
 8
 Section 4 of the Norris-LaGuardia Act, 29 U.S.C.A. 104, deprives a Federal court of 'jurisdiction' to issue an injunction 'in any case involving or growing out of any labor dispute to prohibit any person or persons participating in or interested in such dispute * * * from * * * (e) Giving publicity to the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling, or by any other method not involving fraud or violence.' Section 13(c), 29 U.S.C.A. 113(c), defines 'labor dispute' broadly to include 'any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, Fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee.' Section 13(a), 29 U.S.C.A. 113(a), says that 'A case shall be held to involve or to grow out of a labor dispute when the case involves persons who are engaged in the same industry, trade, craft, or occupation; or have direct or indirect interests therein; * * * or when the case involves any conflicting or competing interests in a 'labor dispute' (as defined in this section) of 'persons participating or interest' therein (as defined in this section).' The latter class in defined in 13(b), 29 U.S.C.A. 113(b), as a person or association against whom relief is sought 'if he or it is engaged in the same industry, trade, craft, or occupation in which such dispute occurs, or has a direct or indirect interest therein, or is a member, officer, or agent of any association composed in whole or in part of employers or employees engaged in such industry, trade, craft, or occupation.'
 
 
 9
 Plaintiff first argues that defendants are in the industry or trade of wood-cutting whereas plaintiff is in that of shipping, hence plaintiff and defendants are not 'persons who are engaged in the same industry, trade, craft, or occupation.' Apart from other possible answers, this argument places more weight on the separate corporate identities of the various Bowater companies than these can properly bear. Assuming, as we may, that plaintiff and Bowater's Newfoundland had sufficient independence to be regarded, in contract or tort litigation, as separate both from the ultimate parent, Bowater Paper Company, Ltd., and from each other, see Bartle v. Home Owners Cooperative, Inc., 309 N.Y. 103, 127 N.E.2d 832 (1955), it does not follow that they ought be so regarded for application of the Norris-LaGuardia Act. Whether a subsidiary corporation is to be considered a separate entity 'cannot be asked, or answered, in vacuo,' Latty, The Corporate Entity as a Solvent of Legal Problems, 34 Mich.L.Rev. 597, 603 (1936); the issues in each case must be resolved in the light of the policy underlying the applicable legal rule, whether of statute or common law. Contrast Hart Steel Co. v. Railroad Supply Co., 244 U.S. 294, 37 S.Ct. 506, 61 L.Ed. 1148 (1917), and Chicago, M. & St. P. Ry. v. Minneapolis Civic & Commerce Ass'n, 247 U.S. 490, 38 S.Ct. 553, 62 L.Ed. 1229 (1918), with In re Gibraltor Amusements, Ltd., 291 F.2d 22 (2 Cir.), cert. denied, 368 U.S. 925, 82 S.Ct. 360, 7 L.Ed.2d 190 (1961), and Empresa Hondurena de Vapores, S.A. v. McLeod, 300 F.2d 222 (2 Cir.1962). As the Supreme Court has repeatedly taught, the policy behind the Norris-LaGuardia Act was a strong one; we cannot think Congress would have meant this to be defeated by the fragmentation of an integrated business into a congeries of corporate entities, however much these might properly be respected for other purposes.[1] Nothing turns on the fact that the picket was not an employee but represented a union seeking to organize employees, Lauf v. E. G. Skinner & Co., 303 U.S. 323, 58 S.Ct. 578, 82 L.Ed. 872 (1938). Neither is there wight in plaintiff's argument that the woods workers in Newfoundland are employed by contractors rather than by Bowater's Newfoundland. For, again apart from other possible answers such as Bowater's assistance to Anglo-Newfoundland, there was abundant evidence that Bowater's and Anglo-Newfoundland were directing the policy as to recognition of the IWA, and 13(c) explicitly tells us that a labor dispute may exist 'regardless of whether the disputants stand in the proximate relation of employer and employee.' See Milk Wagon Drivers' Union, etc. v. Lake Valley Farm Products, Inc., 311 U.S. 91, 61 S.Ct. 122, 85 L.Ed. 63 (1940); Aetna Freight Lines, Inc. v. Clayton, 228 F.2d 384, 386-387 (2 Cir.1955), cert. denied, 351 U.S. 950, 76 S.Ct. 846, 100 L.Ed. 1474 (1956).
 
 
 10
 The applicability of the Norris-LaGuardia Act would thus have been patent if the timber lands had been, say, in Minnesota and a vessel owned by an affiliate of their owner had brought the paper down the lakes to Buffalo from the west rather than the east. The problem here arises from the foreign aspects of the case. These are always important, and may be critical; we have recently recognized that where such aspects exist, statutory words often are not 'stretched to their literal bounds because statutes relating to international matters are construed in accordance with international usage,' Empresa Hondurena de Vapores, S.A. v. McLeod, supra, 300 F.2d at 231. However, in that same opinion, at 233, we pointed out the distinction between the application to a largely foreign setting of an affirmative regulatory statute, there the National Labor Relations Act, 29 U.S.C.A. 151 et seq., and, referring to Marine Cooks, the withholding by the Norris-LaGuardia Act of a particular remedy in a particular set of courts against conduct occurring in our own country. See The Supreme Court, 1959 Term, 74 Harv.L.Rev. 95, 193-194 (1960).
 
 
 11
 We read Marine Cooks as settling a number of points in this area. One is that inapplicability of the picketing provisions of the Labor Management Relations Act of 1947, 29 U.S.C.A. 141 et seq. to a labor dispute because of the latter's foreign contacts, Benz v. Compania Naviera Hidalgo, S.A., 353 U.S. 138, 77 S.Ct. 699, 1 L.Ed.2d 709 (1957), does not carry similar inapplicability of the Narris-LaGuardia Act in its train, 362 U.S. at 369, 80 S.Ct. 779. Another is that the foreign registry of a vessel, there the S.S. Nikolos, does not give a district court 'jurisdiction' to enjoin picketing which the court would not have if the ship flew our own flag, 362 U.S. at 372, 80 S.Ct. 779. A third is that the Norris-LaGuardia Act applies even when, as there, the American seamen who were picketing were not intervening in a dispute between the crew of the vessel and its owner, as in the Benz case, but rather were seeking to discourage labor practices of the owner, to wit, allegedly substandard wages and working conditions under Liberian registry, which the seamen deemed inimical to themselves and their fellow-workers on American-flag ships, 362 U.S. at 371 and fn. 12, 80 S.Ct. 779.
 
 
 12
 With the picketed vessel here treated as owned by the owner of the timber lands and rights, as for reasons previously explained, she must be for Norris-LaGuardia purposes, and postponing the effect of the Newfoundland statute for further consideration, the only singificant difference between Marine Cooks and the instant case is that there American seamen were picketing in an endeavor to force a foreign owner of a vessel in American waters to take steps, presumably higher wages and better working conditions, that would decrease the competitive advantage of foreign-flag over American-flag ships, whereas here American (and perhaps Canadian) woods workers were picketing in an endeavor to force a foreign owner of a vessel in American waters to recognize their union to represent waters to recognize their workers on its lands and, presumably, thereafter to grant higher wages to the latter that would decrease the disparity between the $2.00-$2.10 per hour, found to be the base rate of woods workers who were IWA members in Washington or Oregon, and the $1.10 per hour New-foundland base rate. At first sight, the latter point seems not a difference from Marine Cooks but a similarity with it. However, the situations do differ in that the allegedly low-paid seamen on the S. S. Nikolos had been carrying freight between Mexico and the United States and were themselves in American waters, whereas here the allegedly low-paid workers, although producing material for the American market, remain in Newfoundland. Although this latter factor may make the instant case less appropriate than Marine Cooks for the application of the Norris-LaGuardia Act, on the basis that Congress is not so likely to have been concerned to prevant Federal court injunctions relating to labor disputes where the laborers were never in the United States, another factor, not present in Marine Cooks, works somewhat the other way-- the American union, picketing in the United States, is the very union that is seeking to organize the employees in Newfoundland. The novel question thus posed is whether, with two of the interests that are contending in the foreign country also contending in the United States, we should decline to give the words of the Norris-LaGuardia Act the application which their letter requires, because, in contrast to Marine Cooks, the employees whose wages and working conditions are sought to be affected are never here.
 
 
 13
 We do not find an adequate basis for distinction. The Norris-LaGuardia Act was framed in terms of a withdrawal of jurisdiction, and the Supreme Court has told us in Marine Cooks that 'The fact that a foreign ship enters a United States court as a plaintiff cannot enlarge the jurisdiction of that court,' 362 U.S. at 372, 80 S.Ct. at 784. Under that and other decisions stressing the breadth of the Norris-LaGuardia Act, of which it is enough to cite united States v. Hutcheson, 312 U.S. 219, 230-236, 61 S.Ct. 463, 85 L.Ed. 788 (1941), and Order of Railroad Telegraphers v. Chicago & N.W. Ry. Co., 362 U.S. 330, 335-336, 80 S.Ct. 761, 4 L.Ed.2d 774 (1960), we cannot think 'jurisdiction' is generated by the further fact of permanent absence of the employees from the United States, when the employer (or his Norris-LaGuardia equivalent) and an American union, seeking to organize the foreign employees in an effort to reduce the adverse competitive effect on American workers from lower wages or harder working conditions abroad, are both here. Beyond that we do not need to, and do not, go.
 
 
 14
 Plaintiff argues finally that even if the Norris-LaGuardia Act would otherwise apply, it does not here because of the 1959 Trade Union (Emergency Provisions) Act No. 2 of Newfoundland. Plaintiff says, citing Khedivial Line, S.A.E. v. Seafarers' International Union, 278 F.2d 49, 51 (2 Cir. 1960), that, because of the Newfoundland statute, defendants' 'dispute' is no longer with Bowater's who now could not lawfully recognize the IWA even if it would, but with the Government of Newfoundland. We are not required to decide whether such a contention would be valid if the Newfoundland statute banned all union activity in that Province, or even if it banned the IWA for all time; in such a case we would have to consider whether the Khedivial decision, relating to action by a foreign government in the international political arena, there anti-Israel policies of the United Arab Republic, should be extended to governmental action in the foreign country's own labor scene. Here, even putting aside evidence suggesting that the Newfoundland statute stemmed from the problems which Bowater's and Anglo-Newfoundland were having with the IWA and that the legislature might therefore not be unresponsive to a changed attitude on their part, cf. Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 137, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), we do not read the statute as forever banning the IWA; the Act rather implies that, on a showing of changed conditions, such as a collective bargaining agreement, the Lieutenant-Governor in Council might consent to renewed certification. Thus it cannot fairly be said that an effort by IWA to press Bowater's toward that end is solely a dispute with the Government rather than with the employer-- atleast until Bowater's has tried to achieve governmental approval and has failed. Cf. United States v. General Electric Co., 115 F.Supp. 835, 878 (D.N.J.1953). Also, the record contains evidence that, at the time of the haring, the IWA still had dues-paying members in Newfoundland and was continuing picketing there; this is scarcely consistent with the view that, with the passage of the Act, the dispute became solely one between the IWA and the Newfoundland Government.
 
 
 15
 Since the Norris-LaGuardia Act deprived the District Court of jurisdiction to issue the requested injunction, we find it unnecessary to pass on other points in support of the judgment made by appellee. These are that the complaint did not sufficiently set forth a claim within 28 U.S.C. 1331 or any other heading of district court jurisdiction under c. 85 of Title 28; that, despite Benz v. Compania Naviera Hidalgo, S.A., supra, the controversy was within the jurisdiction of the National Labor Relations Board under 29 U.S.C.A. 158(b)(4); and, in the alternative, that if New York law applies, the picketing was still not unlawful. These issues would require resolution if plaintiff should press its claim for damages, but we need not deal with them now, see Marine Cooks, 362 U.S. at 368 fn. 5, 371 and 372, 80 S.Ct. 779, 4 L.Ed.2d 797.
 
 
 16
 Affirmed.
 
 
 17
 LUMBARD, Chief Judge (dissenting).
 
 
 18
 As I do not believe that the Norris-LaGuardia Act forbids a federal court from issuing an injunction such as the plaintiff here seeks, and as it seems to me that there is sufficient basis for federal jurisdiction and ample reason for granting a preliminary injunction, I dissent and vote to reverse the order of the district court and direct the issuance of a preliminary injunction.
 
 
 19
 On March 6, 1959, in the wake of violence and bloodshed, the Legislature of Newfoundland enacted the 1959 Trade Union (Emergency Provision) Act No. 2.[1] Section 3 of the Act revoked the certification of IWA's Newfoundland locals, and section 4 specifically voided agreements entered into into between the IWA unions and any employer. The IWA argues that the Act does not prevent voluntary recognition of IWA locals by Bowater's Newfoundland, but only precluded certification by the Newfoundland Labour Relations Board. However, the events which prompted the Act's passage make it manifest that the legislature's intent was to outlaw the union as a means of putting a stop to the violent and bloody struggle between the IWA and the employers of the woods workers.[2]
 
 
 20
 There is nothing in the Norris-LaGuardia Act, and in the record of its enactment by the Congress, which furnishes any support for its application to a situation where a union is picketing a foreign vessel in order to bring pressure to bear to assist it in organizing workers in a foreign country in violation of foreign law designed to make such organizing unlawful. In Khedivial Line, S.A.E. v. Seafarers' International Union, 278 F.2d 49 (2 Cir. 1960), this court held that the Norris-LaGuardia Act did not apply to picketing directed at a foreign private employer when the reason for the picketing was the picketers' disagreement with a foreign government's policy decision. In that case we said that 'the shipowner was not the cause of the picketers' grievance. * * * Whatever had been done here was the United Arab Republic's doing, not plaintiff's * * * We do not believe the prohibition of the Norris-LaGuardia Act Against the grant of injunctions in a 'labor dispute' extends to picketing directed against policies of the government of the owner of a vessel as distinguished from activities of the owner.' I believe that this donctrine is equally applicable here. The legislature of Newfoundland has prohibited recognition of IWA locals; and the IWA is picketing plaintiff if retaliation because of its corporate association with another Bowater company on whose land some of the unorganized workers are lumbering.
 
 
 21
 While plaintiff's right to a final decision after trial is not absolutely certain, it can hardly be doubted that it raised questions of a serious and substantial nature and that balancing the hardships involved there would seem to be far less potential harm to the defendants if the injunction is granted than the harm which would accrue to the Bowater companies[3] if a preliminary injunction were denied. Hamilton Watch Co. v. Benrus Watch Co., Inc., 206 F.2d 738, 740 (2 Cir. 1953). This case is unlike the typical labor injunction case, where the entering of a preliminary injunction which may be dissolved one the facts are more fully disclosed can often break the strike. For there the picketers are striking against their own employer, and if prevented from applying immediate economic pressure, have little chance of success; while here the picketing is disigned to apply a more general pressure against an outside employer, and the picketers continue their employment even during the picketing. Therefore, it would not seriously hamper the union activities if it were restrained from picketing plaintiff until a full dress trial could be held and a final determination made; to allow picketing during this interim would cause irreparable harm to the Bowater companies through breach of contracts and possible repture of business relations with the attendant loss of good will in the market where a very substantial proportion of their paper is sold.
 
 
 22
 If my brothers' view is to prevail, it would be well for the Congress to consider now, in light of a shrinking world which could scarcely have been anticipated in 1932, the consequences of applying the Norris-LaGuardia Act to situations which may so seriously affect our foreign relations as the picketing of a foreign vessel. It surely is arguable that the national interest with respect to strikes and picketing which may affect the United States' relations with foreign countries would be better served by the uniformity attainable by restoring some measure of equity jurisdiction to the federal courts under appropriate Congressional guidance, cf. Textile Workers Union of America v. Lincoln Mills, 353 U.S. 448, 456-457, 77 S.Ct. 912, 923, 1 L.Ed.2d 972 (1957), than by leaving such sensitive issues to the varying substantive and procedural laws of fifty states, some of which have statutes modeled on the Norris-LaGuardia Act and others of which do not.[4]
 
 
 23
 Nor are the courts ousted of jurisdiction of this case by the National Labor Relations Act. In San Diego Building Trades Council, etc. v. Garmon, 359 U.S. 236, 245, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), the Supreme Court stated that 'When an activity is arguably subject to 7 or 8 of the (National Labor Relations) Act, the states as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board,' even if the Board declines to assert jurisdiction. However, since the National Labor Relations Act does not apply to a dispute with as many foreign contacts as the present one, Benz v. Compania Naviera Hidalgo, S.A., 353 U.S. 138, 77 S.Ct. 699, 1 L.Ed.2d 709 (1957); Marine Cooks & Stewards, A.F.L. v. Pannama Steamship Co., Ltd., 362 U.S. 365, 369, 80 S.Ct. 779, 4 L.Ed.2d 797 (1960); Empresa Hondurena de Vapores, S.A. v. McLeod, 300 F.2d 222 (2 Cir. 1962), the Board does not have primary jurisdiction and a state or federal court can hear the case. Benz v. Compania Naviera Hidalgo, S.A., supra. Therefore, the district court could hear this case if some ground of federal jurisdiction exists.
 
 
 24
 The plaintiff advances a claim under the treaty 'To regulate the Commerce between the Territories of the United States And of his Britannick Majesty,' signed and ratified in 1815, 8 Stat. 228, and extended indefinitely on August 6, 1827, 8 Stat. 361. This is sufficient to give the district court jurisdiction under 28 U.S.C. 1331 and 1350.
 
 
 25
 Article 1 of the treaty provides that 'inhabitants of the two countries, respectively, shall have liberty freely and securely to come with their ships and cargoes to all such places, ports, and rivers * * * to which other foreigners are permitted to come * * * and, generally, * * * the most complete protection and security for their commerce, but subject always to the laws and statutes of the two countries, respectively.' Under the Supremacy Clause of the United States Constitution, Article VI, clause 2, treaties, along with federal statutes, are the supreme law of the land. See Maiorano v. Baltimore & O.R.R., 213 U.S. 268, 272-273, 29 S.Ct. 424, 53 L.Ed. 792 (1909); Foster v. Neilson, 2 Pet. 253, 314, 7 L.Ed. 415 (1829); United States v. The Schooner Peggy, 1 Cranch 103, 2 L.Ed. 49 (1801); Ware v. Hylton, 3 Dall. 199, 1 L.Ed. 568 (1796); Briggs, The Law of Nations 886 (1952). Thus when the wording of a treaty is sufficiently explicit to permit its application without additional implementing statutes, as is this treaty, and it is reasonably probable that the parties to the treaty intended it to be self-executing, as here, the treaty is enforced without further legislation. See United States v. Percheman, 7 Pet. 51, 87-89, 8 L.Ed. 604 (1833); Sei Fujii v. State, 38 Cal.2d 718, 242 P.2d 617, 619-620 (Cal.1952); 1952); Bacardi Corp. of America v. Domenech, 311 U.S. 150, 161, 61 S.Ct. 219, 85 L.Ed. 98 (1940); Hauenstein v. Lynham, 100 U.S. 483, 25 L.Ed. 628 (1879); 5 Hachworth, Digest of International Law 177-185 (1943).
 
 
 26
 The treaty explicitly confers rights not only upon the two signatory countries, but also upon 'the inhabitants of the two countries.' See Jones v. Meehan, 175 U.S. 1, 20 S.Ct. 1, 44 L.Ed. 49 (1899); Chew Heong v. United States, 112 U.S. 536, 5 S.Ct. 255, 28 L.Ed. 770 (1884); 87 C.J.S. Treaties 25. Although less clear, these rights secured to plaintiff are enforceable not only against the United States government but also against individuals. The United States can fulfill its treaty obligation of protecting the guaranteed freedoms in two ways: first, by not acting contrary to the treaty and, second, by making its courts available to prevent individuals from acting contrary to the treaty. The combination of the Supremacy Clause of the Constitution, a self-executing treaty, and the jurisdiction afforded by 28 U.S.C. 1331 and 1350 imply this second step. In Clark v. Pigeon River Improvement Slide & Boom Co., 52 F.2d 550 (8 Cir. 1931), a treaty with Canada was used as the basis for an injunction against an American company that was interfering with a Canadian company's right of free passage. See also Maiorano v. Baltimore & O.R.R., supra, 213 U.S. at 273, 29 S.Ct. 424.
 
 
 27
 It is, therefore, necessary to ascertain what substantive rights the treaty confers on the plaintiff. Since it provides that inhabitants of the two countries shall have liberty freely to come to all ports 'to which other foreigners are permitted to come,' the substantive rights accorded plaintiff rise no higher than those accorded other foreigners with whose countries we have no treaty. Moreover, it would be illogical to conclude that the treaty was meant to accord plaintiff more freedom than our own citizens have. Therefore, the treaty must be interpreted as meaning that the specified foreigners will be protected from interference with their rights to use American ports when that interference constitutes a tort under either federal or state law foe which any foreigner of American citizen would be similarly protected. Such a construction gives full scope to the phrase 'subject always to the laws and statutes of the two countries.' Thus Article 1 of the treaty does not create any new substantive rights for an individual vis-a-vis another individual, but affords a federal forum for the protection of existing substantive rights. It is altogether understandable that, shortly after the close of our second armed conflict with Great Britain within the space of forty years, Congress should seek to provide a federal forum to decide issues relating to the freedom of British subjects freely and securely to use our ports. Since such disputes might well rise to the level of international incidents, it befits a national tribunal to hear such cases at the trial level. Conferring such a protective jurisdiction is within the competence of the treaty makers. See National Mutual Ins. Co. of Dist. of Col. v. Tidewater Transfer Co., 337 U.S. 582, 69 S.Ct. 1173, 93 L.Ed. 1556 (1949) (opinion of Jackson, J.); Schumacher v. Beeler, 293 U.S. 367, 55 S.Ct. 230, 79 L.Ed. 433 (1934); Hart & Wechsler, The Federal Courts and the Federal System 372 (1953), upholding federal court jurisdiction to enforce certain state created rights.
 
 
 28
 The final question, then, is whether the IWA's action is tortious under federal or state law. For reasons stated above, the National Labor Relations Act does not apply to this case; the field is thus left open to state law. Benz v. Compania Naviera Hidalgo, S.A., 353 U.S. 138, 77 S.Ct. 699, 1 L.Ed.2d 709 (1957).
 
 
 29
 New York has recognized the prima facie tort doctrine, holding tortious the infliction of intentional harm, without excuse of justification. Opera on Tour, Inc. v. Weber, 285 N.Y. 348, 34 N.E.2d 349, 136 A.L.R. 267 (1941); American Guild of Musical Artists, Inc. v. Petrillo, 286 N.Y. 226, 36 N.E.2d 123 (1941); Advance Music Corp. v. American Tobacco Co., 296 N.Y. 79, 70 N.E.2d 401 (1946); Ruza v. Ruza, 286 App.Div. 767, 146 N.Y.S.2d 808 (1955); Brandt v. Winchell, 283 App.Div. 338, 127 N.Y.S.2d 865 (1954); Original Ballet Russe, Ltd. v. Ballet Theatre, Inc., 133 F.2d 187 (2 Cir. (1943). When no lawful labor objective is present, the New York courts have applied this doctrine to labor union activities in general, Opera on Tour, Inc. v. Weber, 285 N.Y. 348, 355, 34 N.E.2d 349, 352, 136 A.L.R. 267 (1941); American Guild of Musical Artists, Inc. v. Petrillo, 286 N.Y. 226, 231, 36 N.E.2d 123, 125-126 (1941) and to picketing in particular, Goodwins, Inc. v. Hagedorn, 303 N.Y. 300, 305, 101 N.E.2d 697, 699, 32 A.L.R.2d 1019 (1951); Edward J. Burke Investigation and Auto Recovery Bureau v. Downey, 22 Misc.2d 911, 197 N.Y.S.2d 89 (1960). At the full trial of this case the district court might well find that the IWA was picketing the plaintiff in order to induce Bowater's Newfoundland to recognize the IWA or its locals and contract with them. Since this would violate the 1959 Trade Union (Emergency Provision) Act No. 2, it would not be a 'lawful labor objective' as that term is used by the New York courts. Nor does New York's version of the Norris-LaGuardia Act, New York Civil Practice Act, 876-a, apply to prohibit injunctive relief when no 'lawful labor objective' is involved. American Guild of Musical Artists, Inc. v. Petrillo, 286 N.Y. 226, 231, 36 N.E.2d 123, 125-126 (1941); Goodwins, Inc. v. Hagedorn, 303 N.Y. 300, 305, 101 N.E.2d 697, 699, 32 A.L.R.2d 1019 (1951); Opera on Tour, Inc. v. Weber, 285 N.Y. 348, 34 N.E.2d 349, 136 A.L.R. 267 (1941).
 
 
 30
 It was an abuse of the discretion of the district court to refuse to grant a preliminary injunction against the picketing of the defendants which was tortious under the law of the State of New York.
 
 
 31
 For these reasons, I would reverse the district court's denial of a preliminary injunction.
 
 
 
 [1]
 For this reason there is not much force in plaintiff's claim that the sign carried by the picket was false in saying that 'S.S. Gladys Bowater' was unfair to organized labor as represented by IWA. Defendants conceded at the argument that the sign could have been better worded and that it might well have been altered if plaintiff has asked that it be. However, since defendants' position was that in substance the whole Bowater enterprise was 'unfair,' they could well claim that every part of it was
 
 
 [1]
 The 1959 Trade Union (Emergency Provisions) Act No. 2 reads, in part, as follows:
 '3.-- (1) Notwithstanding anything contained in the said Act or in any other statute or law, any certification as bargaining agent (hereinafter referred to as 'certification') granted under the said Act to each trade union named in the schedule to this Act is revoked.
 '(2) Where certification granted under the said Act to a trade union is revoked by this Act, the union shall not without the consent of the Lieutenant-Governor in Council apply for certification under the said Act and the Labour Relations Board shall not without the like consent grant certification under the said Act.
 '4. Where certification granted under the said Act to a trade union is revoked by this Act, an agreement entered into and in force on the date of the passing of this Act between the union and an employer is void as from that date and no longer binds the parties to the agreement.
 SCHEDULE
 INTERNATIONAL WOOD WORKERS OF AMERICA LOCAL 2-254
 INTERNATIONAL WOOD WORKERS OF AMERICA LOCAL 2-255'
 
 
 [2]
 In fact the Newfoundland Labour Relations Board found that the woods workers were employed by independent contractors who contracted with Bowater's Newfoundland to have the lumbering done on the latter's land
 
 
 [3]
 Since Judge Friendly decided that for purposes of the Norris-LaGuardia Act we should consider the plaintiff, Bowater Steamship Co., and the logging company, Bowater's Newfoundland, as a single enterprise, it would be only equitable to take regard of the damage to both in deciding whether to issue an injunction
 
 
 [4]
 See Hamilton's statement, The Federalist, No. 80, that the Federal courts were given jurisdiction over maritime causes sinec 'These so generally depend on the law of nations, and so commonly affect the rights of foreigners, that they fall within the considerations which are relative to the public peace,' and also the recent remak of our brother Clark 'And in the international field, certainly we cannot execute the world leadership now thrust upon us, or even safeguard our own furture, if we remain a divided nation of merely separate states.' Federal Procedural Reform and States' Rights; to a More Perfect Union, 40 Tex.L.Rev. 211 (1961)